2006-NMCA-010

126 P.3d 1186

**In the Matter of the Adoption Petition of Paul Fogerson and Shannon Fogerson, Husband and Wife,**

**Katrina VIGIL and Taylor Allen, Movants–Appellants,**

v.

**Paul FOGERSON and Shannon Fogerson, Petitioners– Appellees.**

No. 25,348.

Court of Appeals of New Mexico.

Dec. 5, 2005.

Lynn M. Finnegan, P.A., Lynn M. Finnegan, Los Alamos, for Appellants.

Jane B. Yohalem, Santa Fe, for Appellees.

## OPINION

FRY, J.

{1} In this adoption proceeding brought by adoptive parents Shannon and Paul Fogerson, the birth parents of the child in question sought to withdraw their relinquishment of parental rights and consent to adoption, arguing that: (1) they were denied due process because they were not advised of the consequences of their relinquishment and they were not counseled as required by the applicable statutes, (2) the adoption agency and the prospective adoptive parents fraudulently obtained the relinquishments, and (3) exceptional circumstances having to do with the birth mother's psychological deficiencies and the time constraints surrounding the process warranted withdrawal of the relinquishments and consents. The trial court denied the birth parents' motion to dismiss the adoption petition and their request to withdraw their consents and entered a final decree of adoption.

{2} On appeal, the birth parents make the same arguments they made below. We conclude due process was satisfied because there was compliance with the applicable statutes sufficient to ensure that the birth parents' relinquishments and consents were freely and voluntarily given. We further hold that substantial evidence supports the trial court's determination that there was no fraud or exceptional circumstances justifying withdrawal of consent. We therefore affirm.

## BACKGROUND

{3} On Saturday, October 18, 2003, the birth mother, Katrina Vigil, while alone in her dormitory room at Eastern New Mexico

State University, gave birth to the child. Katrina, aged nineteen, did not realize she was pregnant until two months prior to the birth, whereupon she successfully concealed her pregnancy from her family. When she told the birth father, T.J. Allen, that she was pregnant, he offered to quit school in order to support Katrina and the baby. Because Katrina wanted T.J. to continue his education, she later told him she had miscarried.

{4} The day after giving birth, Sunday, Katrina took the baby to a park and pretended that she had found the baby. Apparently she was not aware of the Safe Haven for Infants Act, NMSA 1978, §§ 24–22–1 to –8 (2001, as amended through 2005), which immunizes a parent who leaves "an infant, ninety days of age or less, at a hospital." § 24–22–1.1. Emergency personnel took the baby and placed him in the custody of the Children, Youth and Families Department (CYFD). Eventually, Katrina admitted to police that she was the baby's mother, and when Katrina learned that CYFD intended to call T.J., she called him first and told him about the baby. Later that same day, a college counselor took Katrina to the hospital for an examination.

{5} The adoptive mother, Petitioner Shannon Fogerson, was a nurse at the same hospital. She had heard about the allegedly abandoned baby and determined that she would like to adopt the child if she could. After consulting with her family, CYFD, and her nursing supervisor, Shannon called adoption counselor Heidi Foshee with Christian Children's Placement Services (CCPS), a licensed private adoption agency, regarding the possibility of adopting. Foshee agreed to deliver the paperwork to Shannon at the hospital and arrived nearly simultaneously with Katrina.

{6} Having been assured by hospital authorities that there were no ethical problems involved in speaking to Katrina, Shannon approached Katrina, introduced herself, and expressed interest in the possibility of adopting the baby if Katrina was interested in that option. Shannon asked Katrina if she would like to talk to Foshee, and Katrina said that she would.

{7} Katrina told Foshee about the birth and Foshee asked Katrina about her plans for the baby. Katrina said she did not want to parent the baby but wanted to place the baby for adoption. During this initial meeting, which lasted about an hour and a half, and at a restaurant later that day, Foshee counseled Katrina about all of her options, including parenting the child, foster care with the state or a private agency, placing the child within her family or T.J.'s family, and adoption by people who were not related to either birth parent. In response to each option, Katrina said she wanted to place the baby for adoption in a permanent home. Katrina further said that she had chosen the Fogersons to be the baby's adoptive parents. According to Foshee, Katrina seemed pleased with her decision, confident, encouraged, and relieved.

{8} The following day, Monday, Foshee spoke by telephone with T.J., who was attending school at Texas Tech in Lubbock, Texas. T.J. told Foshee he wanted to place the baby for adoption and that he agreed with Katrina about placing the child with the Fogersons. Foshee told T.J. that she needed to speak with him in person privately to discuss the various options available to him. She also told T.J. that it was her job to counsel him privately. Each time Foshee asked T.J. to meet with her privately, he refused. T.J. told Foshee that he and Katrina were making their decision together. Foshee ultimately agreed to take Katrina with her to Lubbock to meet with T.J.

{9} Foshee and Katrina met with T.J. on Wednesday in a Lubbock restaurant for about two hours. Foshee discussed with T.J. the same options she had discussed with Katrina. Although Foshee consistently encouraged the young people to tell their parents about the birth of the baby, the birth parents said that they were adults and they would make their own decision about the child. T.J. and Katrina said that they had chosen adoption, and T.J. said he agreed with Katrina's choice of the Fogersons as the adoptive parents. According to Foshee, T.J. appeared calm, clear-minded, and concerned for the child's welfare.

{10} That evening, Katrina's parents, who live in Los Alamos, learned about the baby's birth through an anonymous phone call. T.J.'s parents, also residents of Los Alamos, learned about it the following day, Thursday. That same day, Katrina's mother Holly called Foshee. According to Foshee, Holly said that she had discussed with Katrina the various options for the baby and that she would support whatever decision Katrina and T.J. made. Foshee testified that she discussed with Holly the possibility of placing the baby with either set of grandparents. Holly told Foshee that if the relationship between Katrina and T.J. did not continue, it would be awkward for Katrina and T.J. to return to Los Alamos and have the child residing there.

{11} The parties dispute whether Katrina and T.J. had an understanding with the Fogersons that the adoption would be "open." Although Katrina testified that she believed this would be an open adoption, other witnesses did not support this view. Shannon testified that when she spoke to Katrina on the Thursday following the birth, she asked Katrina if she wanted pictures of the baby and letters following the adoption. Katrina responded that she "want[ed] very limited contact because [she had] to go on with [her] life." Foshee testified that "open adoption" as defined by NMSA 1978, § 32A–5–35 (1995) was never contemplated by the parties.

{12} At one point during the week following the birth, Foshee took Katrina to the office of Eric Dixon, a private attorney, to discuss how to get the baby out of CYFD's custody and into the custody of the Fogersons. Although Katrina testified that she thought Dixon was representing her, she wasn't sure; the only time she met with him was when Foshee was present. By contrast, Dixon testified that he met with Katrina and Foshee because Foshee was a friend. He further testified that no attorney-client relationship was established at this meeting.

{13} The relinquishments of Katrina and T.J. were taken on Saturday, October 25, 2003, one week after the child's birth, at the office of attorney Marion Rutter. T.J.'s parents and Katrina's grandparents were also there. Prior to that day, Foshee prepared counseling narratives that became part of the relinquishment documents, and she went over them with Katrina and T.J. The narratives detailed the counseling each birth parent had received and recited the reasons for the relinquishments. The narratives stated that each birth parent felt it was "the wrong time in ... life to parent a child" because of each parent's youth, and that each birth parent wanted the child to be placed in a "two-parent, financially stable" adoptive home. Neither Katrina nor T.J. made any corrections to the narratives. At Rutter's office, Foshee spoke privately with T.J. and asked him if he was certain about his decision and whether he had any questions. He responded that this was what he wanted to do.

{14} Dixon met privately with T.J. and, after T.J. read the relinquishment form, Dixon told T.J. he did not have to sign the relinquishment but that if he did sign it, the relinquishment would be permanent and T.J. could not come back and try to get custody. T.J. said he understood and that he was anxious to resolve the situation. Dixon told T.J. he could take all the time he wanted and that he could explore alternatives, but T.J. said he wanted to sign the relinquishment. Dixon testified that during the discussion the topic of open adoption did not come up. In Dixon's opinion, T.J.'s relinquishment was freely and voluntarily made.

{15} Rutter met privately with Katrina to go over her relinquishment form. He talked to Katrina about the finality of the relinquishment and explained that once the relinquishment was done, it could not be undone. He asked Katrina if anyone had made promises to her or threatened her to sign the relinquishment, and she said no; she said she wanted to do it and that she understood the finality. Rutter testified there was no doubt in his mind that Katrina's relinquishment was free and voluntary.

{16} Charles Anderson, the director of CCPS, oversaw the signing of each relinquishment form. He confirmed with both Katrina and T.J. that each had received counseling and legal counsel and that each understood that the relinquishment was a final, irrevocable document. According to

Anderson, neither birth parent voiced any reservation or reluctance about the relinquishment and consent to adoption. If they had, Anderson would have advised them to wait and not sign the relinquishment. In his opinion, the relinquishments of Katrina and T.J. were intelligently, voluntarily, and knowingly made.

{17} The weekend after the birth parents signed the relinquishments, Katrina's parents went to Portales and, in a visit arranged by Foshee, they spent some time alone with the baby. It was at this point that Katrina's parents intellectually committed to the idea of taking the baby themselves. Prior to that weekend, according to Foshee, Katrina's parents had been in full support of whatever decision Katrina and T.J. made about placement of the baby. Sometime during the week after they saw the baby, Katrina's parents told her they wanted to take the baby and that they were going to call a lawyer. Foshee testified that, even after Katrina's parents decided to contact a lawyer, Katrina said she was happy with her decision to place the baby with the Fogersons because she knew the baby was in good hands and "where he needs to be."

{18} The Fogersons filed a petition for adoption on November 21, 2003, about a month after the baby's birth. Shortly after that, the birth parents filed a motion to dismiss the petition and a request to withdraw their consent to the adoption. They alleged that their consents were fraudulently induced by promises of an open adoption and, even in the absence of fraud, that exceptional circumstances would permit withdrawal of consent. The birth parents' motion made it clear that if they were allowed to withdraw their relinquishments and consents, the child's grandparents would raise him.

{19} Following a lengthy hearing, the trial court concluded that the birth parents had failed to prove that their relinquishments and consents were obtained by fraud and that no exceptional circumstances justified withdrawal of the relinquishments and consents. It further concluded that the birth parents' consents and relinquishments "were knowing, intelligent and voluntary and not the product of any unlawful influence." The trial court

determined that the Fogersons proved the allegations of their adoption petition by clear and convincing evidence and that it was in the best interests of the child to grant the petition. This appeal followed.

## DISCUSSION

### I. THE BIRTH PARENTS RECEIVED DUE PROCESS

{20} In support of their argument that they were denied procedural due process, the birth parents contend (1) they were not advised of the consequences of relinquishment by anyone and (2) they were not counseled as required by statute and regulation. In response, the Fogersons argue that the birth parents failed to preserve their due process argument and, even if they did preserve, there was no state action triggering due process safeguards.

### A. THE BIRTH PARENTS PRE-SERVED THEIR DUE PROCESS ARGUMENT

{21} The purpose of the preservation requirement is to "allow[ ] the district court an opportunity to correct error, thereby avoiding the need for appeal, [while] at the same time creating a record from which the appellate court can make an informed decision." *Crutchfield v. N.M. Dep't of Taxation & Revenue*, 2005–NMCA–022, ¶ 14, 137 N.M. 26, 106 P.3d 1273. Our review of the record convinces us that the birth parents invoked a ruling by the trial court on their contentions and thereby preserved the due process arguments they now make on appeal.

{22} The gist of the birth parents' argument is that pre-relinquishment counseling was inadequate and no one explained to them that the adoption of their baby would not be an "open" adoption, which would permit them and their families to have visitation with the baby indefinitely into the future. Because of these alleged flaws in the proceedings, the birth parents claim their relinquishments were not "free, voluntary, and made with full knowledge of the consequences." *In re Kira M.*, 118 N.M. 563, 569, 883 P.2d 149, 155 (1994). It is apparent that the birth parents' counsel emphasized this contention through her questioning of wit-

nesses at the hearing and through argument to the trial court. In addition, in their requested findings and conclusions, the birth parents specifically mentioned due process protections, compliance with statutory requirements, and the necessity that relinquishments be voluntarily made. It is true, as the Fogersons argue, that the birth parents' arguments along these lines were made in the context of their contention that exceptional circumstances warranted withdrawal of consent. But regardless of the specific "heading" under which the birth parents made the arguments known, they clearly called the trial court's attention to the substance of their contentions, as demonstrated by the court's findings regarding statutory compliance and the voluntariness of the relinquishments.

## B. WE ASSUME THERE WAS STATE ACTION

{23} The relinquishments and consents at issue here were obtained through the auspices of CCPS, a private adoption agency. The Fogersons contend this translates into an absence of the state action necessary to trigger due process safeguards. There is authority that supports the Fogersons' argument. *See, e.g., Johnson v. Rodrigues (Orozco)*, 293 F.3d 1196, 1199 (10th Cir.2002) (determining that a claim based upon a Fourteenth Amendment deprivation could not properly be lodged against adoptive parents and a private adoption agency because there was no state action). But there is also authority concluding that a private adoption agency is a state actor for purposes of Fourteenth Amendment analysis. *See, e.g., Scott v. Family Ministries*, 65 Cal.App.3d 492, 135 Cal.Rptr. 430, 438 (1976) (holding that private adoption agency that imposed religious-affiliation requirements for placement of children was a state actor for purposes of the establishment clauses of the United States and California constitutions). Because we conclude the procedures surrounding the relinquishments and consents complied with due process requirements, we need not definitively decide this question. We assume, without deciding, that the actions of CCPS constituted state action.

## C. THE PROCEDURES EMPLOYED SATISFIED DUE PROCESS

{24} The birth parents correctly note that this Court has "recognized that process is due when a proceeding affects or interferes with the parent-child relationship." *State ex rel. Children, Youth & Families Dep't v. Maria C.*, 2004–NMCA–083, ¶ 24, 136 N.M. 53, 94 P.3d 796. In the context of the voluntary relinquishment of parental rights and consent to adoption, our legislature has established certain procedures that must be followed. The birth parents do not contend that the statutory procedures provide inadequate due process protections. *Cf. id.* (noting that the procedures provided by the legislature "do not define minimum due process requirements"). Instead, they argue that CCPS did not comply with statutory requirements and that the relinquishments and consents were therefore not voluntary.

{25} "Although we give substantial weight to the judgment of our legislators that the procedures they have provided assure fundamental fairness, the procedures which they have deemed necessary do not define minimum due process requirements." *Id.* (citation omitted). We would ordinarily undertake an analysis of the applicable statutes under the factors in *Mathews v. Eldridge*, 424 U.S. 319, 334–45, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to determine whether due process has been afforded. *See State ex rel. Children, Youth & Families Dep't v. Frank G.*, 2005–NMCA–026, ¶ 34, 137 N.M. 137, 108 P.3d 543, *cert. granted by*, 2005–NMCERT–002, 137 N.M. 266, 110 P.3d 74 (applying *Mathews'* three-part balancing test to trial court's admission of hearsay statements, which respondents claimed violated their right to due process). However, the birth parents make no argument that the statutory procedures were deficient or unconstitutional. We therefore assume, without deciding, that the Act provides sufficient process for relinquishment of parental rights and consent to adoption.

{26} We now turn to a consideration of whether CCPS complied with the Act's requirements. The interpretation of statutes is a question of law that we review

de novo. *Jacobo v. City of Albuquerque*, 2005–NMCA–105, ¶ 4, 138 N.M. 184, 118 P.3d 189, *cert. granted by*, 2005–NMCERT–008, 138 N.M. 329, 119 P.3d 1266. In addition to interpreting the relevant statutes, we must review the trial court's application of the statutory requirements to the evidence and determine whether substantial evidence supports the trial court's findings of compliance with the statutes. *See* NMSA 1978, § 32A–5–36(D) (2003) (stating that if a birth parent files a petition in an adoption proceeding and alleges the invalidity of his or her consent or relinquishment, the court shall dismiss the petition if it "determines that the allegations have not been proved by a preponderance of the evidence"). When considering whether substantial evidence supports the trial court's findings, "the appellate court resolves all disputes of facts in favor of the successful party and indulges all reasonable inferences in support of the prevailing party." *Las Cruces Prof'l Fire Fighters & Int'l Ass'n of Fire Fighters v. City of Las Cruces*, 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177.

{27} Our Supreme Court has discerned two overriding policy concerns in New Mexico's Adoption Act (the Act), NMSA 1978, §§ 32A–5–1 to –45 (1993, as amended through 2005). First, "the [birth] parents' rights are protected by providing safeguards to ensure relinquishment is free, voluntary, and made with full knowledge of the consequences." *In re Kira M.*, 118 N.M. at 569, 883 P.2d at 155. Second, the Act seeks to "protect[ ] ... the [adoptive] child's best interests by severely limiting the grounds for withdrawal [of relinquishment]." *Id.* These policy considerations are reflected by the specific provisions of the Act.

{28} The form of consent and relinquishment is governed by Section 32A–5–21.[1] The relevant portions of that section provide:

A. Except when consent or relinquishment is implied, a consent or relinquishment by a parent shall be in writing, signed by the parent consenting or relinquishing and shall state the following:

. . .

(5) that the person executing the consent or relinquishment has been counseled, as provided in Section 32A–5–22 NMSA 1978, by a certified counselor of the person's choice and with this knowledge the person is voluntarily and unequivocally consenting to the adoption of the named adoptee;

(6) that the consenting party has been advised of the legal consequences of the relinquishment or consent either by independent legal counsel or a judge;

(7) that the consent to or relinquishment for adoption cannot be withdrawn[.]

There is no dispute that the consent and relinquishment forms signed by Katrina and T.J. contained these required statements. The birth parents contend the taking of their relinquishments and consents was procedurally flawed and that they did not receive the counseling required by the Act.

{29} Section 32A–5–23 states the requirements for the taking of relinquishments and consents and provides in pertinent part:

A. A consent to adoption or relinquishment of parental rights shall be signed before and approved by:

(1) a judge who has jurisdiction over adoption proceedings, within or without this state, and who is in the jurisdiction in which the child is present or in which the parent resides at the time it is signed; or

(2) an individual appointed by the department to take consents or relinquishments or by an agency licensed by the state, but only when the consenting or relinquishing parent is represented by independent legal counsel[.]

There is no dispute that Charles Anderson, the director of CCPS, was authorized to take the consents and relinquishments. He witnessed the birth parents' signing of and approved the relinquishment and consent forms. The birth parents contend Anderson was perfunctory in his oversight of this critical event and failed to ensure that they fully understood the consequences of their actions.

---

1. In this opinion we refer to the version of the Act in effect at the time of the relinquishments, which was the one in effect prior to the 2005 amendments.

830

{30} We do not agree. Anderson testified that he made sure the birth parents understood the ramifications of what they were doing, that the relinquishment and consent were final and irrevocable, that they had received legal advice and counseling about all alternatives available to them, and that they agreed with the counseling narrative attached to each respective relinquishment/consent form. He spent about an hour with the birth parents before the signing, and he did not hear any reluctance or reservations from either Katrina or T.J. about their course of action. In short, the evidence supports the inference that Anderson satisfied himself that the birth parents fully understood the consequences of the relinquishment and consent. We see no meaningful difference between Anderson's taking of the relinquishments and consents and the actions of the trial judge in *In re Kira M.,* which the birth parents hold up as the model. *See In re Kira M.,* 118 N.M. at 565–66, 569–70, 883 P.2d at 151–52, 155–56 (observing that the trial judge who took birth mother's relinquishment "took great pains to ensure that the relinquishment was her own freely-made decision" after an "extended inquiry")

{31} The birth parents also contend they did not have independent, effective legal counsel prior to signing the relinquishments and consents. They argue that T.J.'s attorney, Eric Dixon, was not independent because he had previously represented Katrina and CCPS in negotiations with CYFD about transferring custody of the baby to CCPS. This prior representation, according to the birth parents, "blurred the distinction of his loyalties." They rely on *State v. Joanna V.,* 2004–NMSC–024, 136 N.M. 40, 94 P.3d 783, in support of their argument.

{32} We are not persuaded. In *Joanna V.,* the Supreme Court considered whether there was a conflict of interest amounting to ineffective assistance of counsel when the defendant's attorney served as both her guardian ad litem in abuse and neglect proceedings and then as her defense attorney in delinquency proceedings. *Id.* ¶ 1. The analysis in *Joanna V.* has no place in the present case, however, because unlike the circumstances in *Joanna V.,* Sixth Amendment

rights are not triggered. *See id.* ¶ 5 (noting that the Sixth Amendment guarantees the right to effective assistance of counsel free from conflicts of interest). Although Sixth Amendment guarantees apply in abuse and neglect proceedings, *Maria C.,* 2004–NMCA–083, ¶ 48, 136 N.M. 53, 94 P.3d 796, the birth parents have not cited to any authority recognizing the same guarantees in cases involving relinquishment of parental rights. *See ITT Educ. Servs., Inc. v. Taxation & Revenue Dep't,* 1998–NMCA–078, ¶ 10, 125 N.M. 244, 959 P.2d 969 (explaining that appellate court will not consider proposition in brief unsupported by citation to authority).

{33} Further, there is nothing in the record suggesting that Dixon was afflicted with a divided sense of loyalty that impacted his ability to provide T.J. with sound legal advice. Dixon testified that, out of courtesy to Foshee, he attempted to help Katrina and CCPS arrange for the transfer of custody from CYFD to CCPS. We fail to see how this conduct prevented Dixon from providing independent counsel to T.J. regarding the consequences of the relinquishment and consent.

{34} Both birth parents claim their respective attorneys were not zealous advocates for them because the attorneys failed to counsel them regarding their desire for an open adoption. Katrina testified that she specifically remembers telling Rutter that she had been promised an open adoption, and the counseling narratives attached to each parent's relinquishment/consent form mentioned the fact that the birth parents would like to be able to visit the child in the future. But both attorneys testified that their respective clients did not raise the issue of open adoption before they signed the forms. Rutter testified that he went over the relinquishment and consent form with Katrina and that she did not raise the issue of open adoption or any other conditions on her relinquishment and consent. He specifically asked her if she had been promised anything, and she denied that she had. Similarly, Dixon testified that the topic of open adoption did not come up, and that he advised T.J. that if he signed the relinquishment/consent he could not come back later and try to get custody of the child. "[W]hen there is a

conflict in the testimony, we defer to the trier of fact." *Buckingham v. Ryan,* 1998–NMCA–012, ¶ 10, 124 N.M. 498, 953 P.2d 33.

{35} The birth parents next argue that T.J. never received the individual counseling mandated by the Act. Section 32A–5–22 provides that counseling must occur prior to relinquishment of parental rights and consent to adoption. § 32A–5–22(A). The birth parent "shall be counseled regarding alternatives to and the consequences of adoption," § 32A–5–22(C)(2), and the parent "shall be counseled individually without the presence of any other person for a minimum of one counseling session." § 32A–5–22(D)(1).

{36} Foshee testified that in her initial phone call to T.J. she told him she needed to speak to him alone and that it was her job to counsel him privately. T.J. said he and Katrina were making a decision about the baby together and that they could therefore be counseled together. He told Foshee he wanted to place the baby for adoption and he agreed with Katrina's decision to place the baby with the Fogersons.

{37} Foshee met with T.J. and Katrina together on Wednesday, three days before the signing of the relinquishment/consent forms. At this meeting Foshee discussed with the birth parents all of the options available to them, including parenting the child, voluntary foster care with CYFD or another agency, temporary care of the child, placement with family members or friends, and adoption. During this two-hour discussion, Foshee testified that T.J. appeared to be calm, clear-minded, and concerned for the child's welfare. At the conclusion of the meeting, T.J. again stated that his preference was to place the child with the Fogersons.

{38} Although Foshee asked T.J. four times to speak with her privately during the week following the child's birth, T.J. said he didn't need to be counseled privately. When the birth parents and Foshee met at Rutter's office on Saturday for the signing of the relinquishment/consent forms, Foshee spoke with T.J. alone and asked him whether he would like to speak with her privately, whether he had any questions, and whether he was sure about his decision. T.J. responded that this was what he wanted to do.

{39} The birth parents argue that the failure to counsel T.J. privately violated the requirement of Section 32A–5–22(D)(1). While it is true that Foshee's counseling of T.J. did not strictly comply with the statute because it was not private, we do not agree that this compels the conclusion that T.J.'s consent was involuntary. Foshee could not force T.J. to meet with her privately, and the counseling she provided substantially complied with the statutory requirements. *See* 2 Am.Jur.2d *Adoption* § 95 (2004) (noting authority that "there must be substantial if not strict compliance with whatever specific statutory requirements are prescribed with respect to the formalities of the execution of the parent's consent"). Because the statutory requirements are intended to ensure the voluntariness of relinquishments and consents, *In re Kira M.,* 118 N.M. at 569, 883 P.2d at 155, we are satisfied that the birth parents received due process.

{40} We find support for our view in analogous cases addressing the voluntariness of guilty pleas. As in the present circumstances, the paramount concern with respect to guilty pleas is that they be knowingly and voluntarily given. *State v. Garcia,* 121 N.M. 544, 547, 915 P.2d 300, 303 (1996). And, like the procedures mandated by the Act, specific procedures are required prior to the acceptance of a guilty plea. Rule 5–303(E) NMRA (specifying the content of a trial court's inquiry of a defendant before acceptance of a guilty plea). In the context of guilty pleas, our Supreme Court has held "that absent a showing of prejudice to the defendant's right to understand his guilty plea and its consequences, substantial compliance with [the procedural prerequisites] is sufficient." *Garcia,* 121 N.M. at 547, 915 P.2d at 303.

{41} We think it is reasonable to apply a similar standard to compliance with the procedures governing relinquishment and consent. Insistence on strict adherence to every aspect of the Act's requirements makes little sense if a failure to strictly comply does not result in prejudice to a birth parent's right to understand the consequences of relinquishment and consent. Therefore, as in the case of a guilty plea,

each case should be "review[ed] on its own unique facts." *Id.*

{42} Here, there is nothing in the record to suggest that the lack of private counseling influenced or impacted T.J.'s decision in any way. T.J. himself did not testify to this effect and the evidence suggests otherwise. T.J.'s reasons for relinquishment stated in the narrative attached to his relinquishment/consent form, which T.J. testified accurately stated his feelings at the time, reflect thoughtful consideration of the choices available to him and the consequences of relinquishment. The narrative stated:

> [T.J.] states he feels this is the wrong time in his life to parent a child. He is not [at] a point in his life where he can provide a good home for his son. He also stated he feels he is too young to parent and that his youth would make things more difficult for him, the baby, and Katrina. TJ [T.J.] feels choosing an adoptive placement is a responsible way to provide a loving, two-parent, financially stable home for his child since he is not able to provide those things right now.

Furthermore, the witnesses who did counsel T.J. all testified that, based on their interaction with him, T.J.'s relinquishment was knowing and voluntary.

{43} The record also reflects that T.J. understood what he was giving up and that his relinquishment was irrevocable. He signed a form stating:

> I have been informed, and understand that the signing of this document has the following effects:
>
> 1. I give up all my legal rights to the child.
> 2. The CCPS will take on the responsibility of caring for my child, selecting an adoptive family for the child, placing the child for adoption and supervising the adoption until all procedures are finalized and the child legally the child [sic] of the adoptive family.
> 3. I waive any further notice of the proceedings relating to the adoption or any other legal actions concerning my child.
> 4. That this document is final and binding and that the child cannot later be reclaimed by me nor this document withdrawn.

T.J. testified that he understood this document and that it and the attached narrative accurately reflected his feelings at the time he signed the document. We find no evidence suggesting that the lack of private counseling prejudiced T.J.'s ability to understand and appreciate the significance of his actions.

{44} In summary, the Act's procedural requirements provide due process safeguards for parents who choose to relinquish their parental rights in order "to ensure relinquishment is free, voluntary, and made with full knowledge of the consequences." *In re Kira M.,* 118 N.M. at 569, 883 P.2d at 155. The trial court's conclusion that the birth parents' relinquishments were voluntarily made is supported by evidence that Anderson properly oversaw the taking of the relinquishments and that each birth parent received counseling and independent legal advice. Although T.J. never received completely private counseling, he refused the offer of private counseling four times and there is no suggestion in the record that the lack of private counseling impacted his decision to relinquish his parental rights. Therefore, CCPS substantially complied with the statutory requirements applicable to relinquishments, and due process was satisfied.

## II. THERE ARE NO OTHER GROUNDS FOR WITHDRAWAL OF THE RELINQUISHMENTS

{45} It is settled law in New Mexico that a relinquishment of parental rights or a consent to adoption may be withdrawn only on grounds of (1) fraud or (2) in the event of exceptional circumstances consistent with the best interests of the child. *See* § 32A–5–21(I) (providing for the withdrawal of a consent or relinquishment only if "the consent or relinquishment was obtained by fraud"); *In re Kira M.,* 118 N.M. at 570, 883 P.2d at 156 (holding that "the legislature has limited the grounds for revocation to fraud" and that an alternative basis for revocation can arise "under [the trial court's] reservoir of equitable

power to protect the interests of natural parents in exceptional cases"). The birth parents invoke both grounds for withdrawal of their relinquishments. We address each in turn.

## A. THE BIRTH PARENTS FAILED TO PROVE FRAUD

{46} The birth parents claim CCPS, Foshee, and the Fogersons fraudulently induced them to relinquish their parental rights by failing to explain that the Fogersons were unwilling to agree to the openness in the adoption that Katrina and T.J. wanted and by leading them to believe there was a need for immediate relinquishment. The trial court found that "[n]either [of the birth parents] were induced to relinquish their parental rights or consent to adoption by any false representation."

{47} The birth parents do not challenge the trial court's findings of fact, which ordinarily means that the findings are conclusive. *See Crutchfield*, 2005-NMCA-022, ¶ 17, 137 N.M. 26, 106 P.3d 1273 (explaining that an unchallenged finding is binding on appeal). But even if we give the birth parents the benefit of the doubt and consider their argument to be an implicit attack on the court's findings, we consider "whether the law correctly was applied to the facts, viewing them in a manner most favorable to the prevailing party, indulging all reasonable inferences in support of the court's decision, and disregarding all inferences or evidence to the contrary." *Id.* ¶ 28.

{48} The birth parents rely on a Texas court's definition of fraud as "an act, omission, or concealment in breach of a legal duty, trust, or confidence justly imposed, when the breach causes injury to another or the taking of an undue and unconscientious advantage." *Vela v. Marywood*, 17 S.W.3d 750, 760 (Tex.App.2000). We need not rely on Texas law because there is relevant New Mexico law that we apply.

{49} In New Mexico, fraud is defined as "a false representation, knowingly or recklessly made, with the intent to deceive, on which the other party acted to his [or her] detriment." *Robertson v. Carmel Builders*

*Real Estate*, 2004-NMCA-056, ¶ 26, 135 N.M. 641, 92 P.3d 653. The birth parents cannot point to any evidence supporting the inference that CCPS, Foshee, or the Fogersons knowingly or recklessly made any false representations to them.

{50} First, with respect to the argument that they were misled about the lack of openness in the adoption, Katrina testified that Shannon Fogerson expressed a willingness to provide pictures of the baby and said Katrina could see the baby any time. Shannon Fogerson testified that she remains willing to send yearly pictures and letters to the birth parents. Consequently, the only remaining bone of controversy is the alleged agreement to allow the birth parents unrestricted visitation with the baby. On this issue the testimony of both Foshee and Shannon Fogerson contradicted Katrina's testimony. Foshee testified that she was familiar with the statutory concept of open adoption provided by Section 32A-5-35, which requires a formal agreement between birth parents and prospective adoptive parents. However, she said this type of open adoption was never contemplated by the parties. Shannon Fogerson testified that she asked Katrina only if she wanted pictures and letters about the baby more than once a year, and Katrina replied that she wanted very limited contact. In addition, Dixon testified that T.J. did not raise the issue of open adoption at any time. Rutter also testified that he did not recall Katrina ever talking about open adoption.

{51} Second, as to whether the birth parents were misled about the urgency of relinquishment, Katrina had been charged with abuse and neglect, and a court hearing on these charges was set for Monday, October 27. Katrina and T.J. signed their relinquishments on the Saturday before the hearing. While Katrina testified generally that under these circumstances she did not feel she had enough time to make an educated decision about her options, neither Katrina nor T.J. specified any misrepresentations made by any particular persons. Katrina testified that when she was at a meeting on Friday with Foshee, Dixon, and representatives from CYFD, they talked about "strik[ing] a deal" to avoid going to court on Monday, but she

did not say anyone told her that such a "deal" was in any way related to completion of relinquishment. She testified that she "felt" there was a deadline for her to make a decision related to the court date and that no one mentioned to her the possibility of a continuance. She said she was "under the impression" that if she signed her rights away she would not have to go to court.

{52} Katrina's testimony does not support an inference that anyone made any intentional or reckless misrepresentations about the urgency of the relinquishment. On the basis of Katrina's testimony, a reasonable fact finder could not determine whether she felt the urgency as a result of something someone told her or as a result of her own speculation. "Feelings" and "understandings" arising from unspecified sources cannot form the basis for a finding of fraud. *See Robertson*, 2004–NMCA–056, ¶ 25, 135 N.M. 641, 92 P.3d 653 (stating that fraud must be proved by clear and convincing evidence).

{53} At bottom, the birth parents' fraud argument depends on the notion that Foshee and the Fogersons had the legal duty (1) to advise them about the difference between a statutorily sanctioned open adoption and one where the prospective adoptive parents do not agree to any openness, (2) to clarify that the Fogersons wanted to provide only a very limited amount of information about the baby, and (3) to inform them that the relinquishments were in no way tied to the court date on the abuse and neglect charges. Although our case law recognizes that, in contexts other than relinquishment and consent to adopt, "[a] duty to disclose may arise if there is knowledge that the other party to a contemplated transaction is acting under a mistaken belief," *Krupiak v. Payton*, 90 N.M. 252, 253, 561 P.2d 1345, 1346 (1977), the birth parents failed to show that Foshee, CCPS, or the Fogersons knew the birth parents were acting under a mistaken belief. Furthermore, we are not convinced that the kind of fraud at issue in *Krupiak* would support withdrawal of relinquishment or consent. Indeed, our Supreme Court made it clear in *In re Kira M.* that the fraud ground for withdrawal of a relinquishment, as stated in Section 32A–5–21(I), does not include "du-

ress, undue influence, coercion, mistake, error, or lack of understanding." *In re Kira M.*, 118 N.M. at 568–69, 883 P.2d at 154–55. We conclude the trial court's findings regarding the absence of fraud are supported by substantial evidence.

## B. NO EXCEPTIONAL CIRCUMSTANCES WARRANT WITHDRAWAL OF RELINQUISHMENT AND CONSENT

{54} In *In re Kira M.*, the Supreme Court held:

[Although] the legislature has not authorized revocation [of relinquishment or consent] on grounds other than fraud, we also recognize that the children's court has the power to grant the request of a natural parent to withdraw consent under exceptional circumstances falling outside the specific grounds enunciated in Section 48–7–38(F). Any such order must, of course, be consistent with the best interests of the child, which must be given paramount consideration.

118 N.M. at 570, 883 P.2d at 156. This Court relied on this exceptional circumstances exception in *Drummond v. Drummond* and affirmed the trial court's reopening of a sham adoption entered into by the child's maternal grandparents for the purpose of increasing their Social Security income while the child's mother remained the child's parent for all intents and purposes. 1997–NMCA–094, ¶¶ 2, 4, 15–17, 123 N.M. 727, 945 P.2d 457. We remanded the case for an analysis of the best interests of the child. *Id.* ¶ 20.

{55} The birth parents invoke this exception, arguing that Katrina's psychological condition at the time of the birth and relinquishment, combined with the rush to relinquishment purportedly imposed by Foshee, the Fogersons, and the attorneys involved, provide equitable grounds mandating withdrawal of the birth parents' relinquishments and consents.

{56} "We review a trial court's decision to grant or deny equitable relief for abuse of discretion." *AMKCO, Co. v. Welborn*, 2001–NMSC–012, ¶ 8, 130 N.M. 155, 21 P.3d 24. "Where the court's discretion is

fact-based, we must look at the facts relied on by the trial court as a basis for the exercise of its discretion, to determine if these facts are supported by substantial evidence." *Apodaca v. AAA Gas Co.,* 2003–NMCA–085, ¶ 60, 134 N.M. 77, 73 P.3d 215 (internal quotation marks and citation omitted).

{57} The trial court found that "[n]o exceptional circumstances exist to justify granting withdrawal of the relinquishments and consents of [the birth parents]." It further found that "[i]t is in the best interest of the minor child to approve the Fogerson[s'][p]etition for [a]doption." We conclude that substantial evidence supports these findings.

{58} First, although the birth parents' expert psychologist opined that Katrina's "disposition to depression, tendency toward impulsive, ill-advised actions, and substantial impairment in reality testing" made it impossible for Katrina to voluntarily relinquish her parental rights and consent to the adoption, there was evidence to the contrary. Katrina's testimony reflected her intelligence and ability to grasp the significance of events in her life. She did not testify that she was unable to appreciate the gravity of her actions or to assess the various options open to her. Instead, she said that placing the child for adoption with the Fogersons made sense to her at the time because her parents were then unwilling to commit to taking the child and because she did not feel ready to parent the child herself. Foshee testified that Katrina was determined to place the child with the Fogersons and never wavered. Rutter testified that Katrina appeared to be intelligent, she had excellent communication skills, and that she exhibited no mental deficiencies. There was no doubt in his mind that Katrina's relinquishment was free and voluntary. Given the extensive counseling Katrina received, the seven days between the birth and the relinquishment, the legal counsel provided to her, and the overall tenor of her testimony, we conclude substantial evidence supports the trial court's determination that Katrina's actions were voluntary and that the psychologist's testimony did not support a finding of exceptional circumstances.

{59} Second, the evidence supports the trial court's determination that the best interests of the child are served by remaining with the Fogersons. The court found that "[a]t this time, [the birth parents are] not fit to exercise the care, custody and control of the child." The relief requested in this case supports this finding because it establishes that neither Katrina nor T.J. wish to parent the child at this time; they want Katrina's parents to act as the child's guardians until they have completed career preparations and settled down. Katrina's mother testified that it would be best if the birth parents defer parenting the child until their lives are more settled. Katrina is still in school and T.J. is in the army. In addition, Foshee and the guardian ad litem were both of the view that it is in the child's best interests to remain with the Fogersons, and the record supports the trial court's finding that the Fogersons "are fit to exercise the care, custody and control of the child."

{60} Viewing the evidence in the light most favorable to the trial court's findings and applying the law of exceptional circumstances as reflected in *In re Kira M.* and *Drummond,* we conclude the evidence of Katrina's mental state at the relevant time and regarding the best interests of the child supports the conclusion that the trial court did not abuse its discretion in concluding that no exceptional circumstances warrant withdrawal of the birth parents' relinquishments and consents. We therefore affirm the trial court's judgment.

**CONCLUSION**

{61} We recognize the tremendous emotional turmoil experienced by young people who, without planning or foresight, find themselves to be parents. In such circumstances, many options are available and the young people must make decisions that are sometimes difficult and imperfect. That is why our legislature requires that parents receive counseling and legal advice before they relinquish their parental rights. *See In re Kira M.,* 118 N.M. at 569, 883 P.2d at 155 (explaining that the legislature has created a two-step process by which the first step protects parents' rights). Here, all statutory prerequisites were substantially complied

with, and the birth parents' fundamental rights were thereby protected.

{62} The legislature has also made it clear that a child's best interests must be safeguarded once the child's parents have made the formidable decision to relinquish, which is why the Act "severely limit[s] the grounds for withdrawal" of relinquishment. *Id.* The birth parents were unable to persuade the trial court that any of these limited grounds existed to warrant disrupting the child's life as part of the Fogerson family. We hold that substantial evidence supports the trial court's determination, and we affirm the trial court's judgment.

{63}  **IT IS SO ORDERED.**

ALARID and CASTILLO, JJ., concur.