145 P.3d 98 (2006)
2006-NMCA-136
In the Matter of the Adoption Petition of Bobby A. Romero and Rosario Romero.
Bobby A. Romero and Rosario Romero, Petitioners-Appellees
HELEN G., Biological Mother-Appellee
v.
MARK J.H., Biological Father-Appellant.
No. 25,877.
Court of Appeals of New Mexico.
September 7, 2006.
Certiorari Granted October 19, 2006.
Certiorari Granted October 24, 2006.
*100 Atencio Law Office, P.C., Harold O. Atencio, Albuquerque, NM, for Appellees Adoptive Parents.
Beall & Biehler, Gregory L. Biehler, Kristin McKeever, Albuquerque, NM for Appellee Biological Mother.
Mark J.H., Edgewood, NM, Pro Se Appellant.
Children, Youth & Families Department, Rebecca J. Liggett, Paula Ganz, Santa Fe, NM, for Children, Youth & Families Department.
Certiorari Granted, No. 30,021, October 19, 2006.
Certiorari Granted, No. 30,027, October 24, 2006.

OPINION
FRY, Judge.
{1} Petitioners have filed a motion for rehearing, which we hereby deny. We withdraw the opinion filed July 26, 2006, and substitute this opinion in its stead.
{2} In this adoption proceeding, in which the district court terminated the biological father's parental rights, we consider under what circumstances our statutes require a biological father's consent to an adoption. Because we conclude the father's consent was required in this case, we also determine what must be shown to terminate parental rights under our presumptive abandonment statute. NMSA 1978, § 32A-5-15(B), (C) (1995). We conclude that a biological father's conduct prior to a child's birth cannot be used as a basis for finding that the father caused the disintegration of the parent-child relationship under the circumstances of this case. We further conclude that the evidence did not support the district court's finding of presumptive abandonment in this case. We therefore reverse the district court's judgment terminating the biological father's parental rights and remand for a consideration of who should have custody of the child. See In re Adoption of J.J.B., 119 N.M. 638, 651, 894 P.2d 994, 1007 (1995) (explaining that reversal of a judgment terminating parental rights in an adoption case results in a separate determination of who should have custody).
BACKGROUND
{3} The parties do not dispute the events leading to the biological mother's pregnancy. (Because the biological mother wishes to retain anonymity, we refer to her and the biological father by their first names, Helen and Mark.) Helen worked at the front desk of a hotel in Albuquerque when she met Mark, an account executive for a chemical company that delivered chemicals to the hotel. Mark helped Helen find a job at another hotel, which is where she worked at the relevant times. Mark and Helen had a sexual relationship from about January 2003 to June 2003; neither used any form of contraception. Mark and Helen ended their relationship in June 2003, and Helen gave birth to the child in February 2004. Mark and Helen had no further communication after their relationship ended, and Helen placed the baby for adoption with Petitioners Bobby Antonio R. and Rosario R. when the child was three days old.
{4} Mark testified that he did not know Helen was pregnant and did not know of the child's existence until he was notified by the adoption agency about two months after the child's birth. The district court apparently did not believe Mark because it found that Mark "knew or should have known that he fathered a child with [Helen]." The evidence supported this finding. See Vigil v. Fogerson, 2006-NMCA-010, ¶ 26, 138 N.M. 822, 126 P.3d 1186 (explaining that appellate court determines whether substantial evidence supports district court's findings, resolving all disputes in favor of the successful party). Helen testified that she told Mark twice that she might be pregnant and that he had at least one opportunity to see her when she was visibly pregnant. In addition, one of Helen's co-workers testified that Mark told the co-worker he knew Helen was pregnant but he did not know if the child was his. It is undisputed that Mark did not provide Helen with any financial support during her pregnancy.
{5} Upon receiving notice from the adoption agency, Mark immediately called the adoption agency and met with the agency's executive director the following day to determine whether he could obtain custody of the child. When he found that he could not, he hired an attorney the same day. He registered *101 with the state's putative father registry the next day. He filed a paternity petition in April 2004 and contested the adoption petition filed by Petitioners. DNA testing established that Mark was in fact the child's biological father.
{6} At trial, Petitioners sought termination of Mark's parental rights on the ground of presumptive abandonment pursuant to Section 32A-5-15(B), (C). After hearing the evidence, the district court concluded that Mark's "actions or lack thereof with regard[ ] to the [child] has created a presumption of abandonment, which has not been rebutted." The court ordered termination of Mark's parental rights and found that it was in the child's best interests to remain with Petitioners. Mark appealed.
DISCUSSION
{7} We begin with the premise "that the relationship between parent and child is constitutionally protected." Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). As the United States Supreme Court said in Prince v. Massachusetts, "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944). However, the law also recognizes that a father's "mere biological relationship with [a] child [does] not warrant the same degree of constitutional protection as a developed parent-child relationship in which an unwed father demonstrates a full commitment to the responsibilities of parenthood." In re Adoption of J.J.B., 119 N.M. at 646, 894 P.2d at 1002.
{8} It is against this backdrop that we analyze the arguments of the parties in this emotionally fraught and difficult case. Our legislature has imposed a statutory framework governing the rights of parents and prospective adoptive parents, while at the same time keeping a child's best interests at the forefront. See NMSA 1978, § 32A-5-2 (1993) (stating that purpose of the Adoption Act is to establish protective and secure adoptive family relationships and to "ensure due process protections"); § 32A-5-15(A) (stating that "[t]he physical, mental and emotional welfare and needs of the child shall be the primary consideration for the termination of parental rights"). It is our task to discern and carry out the legislature's intent in enacting the statutes at issue. See State v. Lopez, 2000-NMCA-001, ¶ 3, 128 N.M. 450, 993 P.2d 767.
{9} In this opinion we address two general areas giving rise to the parties' contentions: (1) whether Mark's consent was required for the adoption of the child by Petitioners, and (2) whether the evidence supported the district court's finding that Mark presumptively abandoned the child.
1. Whether Mark's Consent Was Required
{10} The parties make various arguments regarding whether Mark was an "alleged father" or an "acknowledged father," as those terms are statutorily defined. The parties then argue, based on which label applies, whether Mark's consent was required for Petitioners' adoption of the child. Petitioners contend Mark's consent was not required.
{11} In order to put Petitioners' argument in context, it is helpful to first review the relevant provisions of the Adoption Act. In the course of this review we will address Petitioners' contentions about the meaning of the various provisions of the Act. The interpretation of statutes is a question of law that we review de novo. N.M. Dep't of Labor v. Echostar Commc'ns Corp., 2006-NMCA-047, ¶ 5, 139 N.M. 493, 134 P.3d 780, cert. granted, 2006-NMCERT-004, 139 N.M. 429, 134 P.3d 120. "The language of unambiguous [statutory] provisions must be given effect without further interpretation. Only ambiguous provisions require us to delve into the legislative purpose behind the statute." State v. Jose S., 2005-NMCA-094, ¶ 6, 138 N.M. 44, 116 P.3d 115 (citation omitted).
{12} NMSA 1978, § 32A-5-36(C) (2003) addresses the situation confronted by the district court in the present case. It provides:
C. If any person who claims to be the biological father of the adoptee has appeared *102 before the court and filed a written petition or response seeking custody and assuming financial responsibility of the adoptee, the court shall hear evidence as to the merits of the petition. If the court determines by a preponderance of the evidence that the person is not the biological father of the adoptee or that the child was conceived through an act of rape or incest, the petition shall be dismissed and the person shall no longer be a party to the adoption. If the court determines that the person is the biological father of the adoptee, the court shall further determine whether the person qualifies as a presumed or acknowledged father whose consent is necessary for adoption, pursuant to Section 32A-5-17 NMSA 1978. If the court determines that the person is the biological father, but does not qualify as a presumed or acknowledged father, the court shall adjudicate the person's rights pursuant to the provisions of the Adoption Act.

(Emphasis added.) In this case, the district court determined that Mark is the biological father of the child; therefore, the italicized portion of the statute was applicable, and the district court had to determine whether Mark was a presumed or acknowledged father.
{13} The reason the district court had to make this determination is because the Act provides that "[c]onsent to adoption or relinquishment of parental rights to the department or an agency licensed by the state of New Mexico shall be required of . . . the presumed father of the adoptee . . . [or] the adoptee's acknowledged father." NMSA 1978, § 32A-5-17(A)(4), (5) (2005). In addition, the Act provides that
[t]he consent to adoption or relinquishment of parental rights required pursuant to the provisions of the Adoption Act . . . shall not be required from: . . . an alleged father who has failed to register with the putative father registry within ten days of the child's birth and is not otherwise the acknowledged father.
NMSA 1978, § 32A-5-19(E) (2001) (emphasis added).[1] Thus, consent to adoption is required of a presumed father and an acknowledged father.
{14} Mark was not a "presumed father," which is defined as a person who was married to the biological mother at the time of the child's birth or within a specified time of the child's birth, or who attempted to marry the child's mother. NMSA 1978, § 32A-5-3(V) (2005). However, it appears that Mark may have become an "acknowledged father" shortly after the adoption petition was filed.
{15} According to Section 32A-5-3(F), there are four ways a man can be an acknowledged father, only two of which are relevant to the present case. The two relevant ways are, first, when a father "acknowledges paternity of the adoptee pursuant to the putative father registry, as provided for in Section 32A-5-20," § 32A-5-3(F)(1), or, second, when a father
has openly held out the adoptee as his own child by establishing a custodial, personal or financial relationship with the adoptee as follows:
(a) for an adoptee under six months old at the time of placement: 1) has initiated an action to establish paternity; 2) is living with the adoptee at the time the adoption petition is filed; 3) has lived with the mother a minimum of ninety days during the two-hundred-eighty-day-period prior to the birth or placement of the adoptee; 4) has lived with the adoptee within the ninety days immediately preceding the adoptive placement; 5) has provided reasonable and fair financial support to the mother during the pregnancy and in connection with the adoptee's birth in accordance with his means and when not prevented from doing so by the person or authorized agency having lawful custody of the adoptee or the adoptee's mother; 6) has continuously *103 paid child support to the mother since the adoptee's birth in an amount at least equal to the amount provided in [NMSA 1978, § 40-4-11.1 (1995)], or has brought current any delinquent child support payments; or 7) any other factor the court deems necessary to establish a custodial, personal or financial relationship with the adoptee[.]
§ 32A-5-3(F)(4) (emphasis added). Thus, the second way  "establishing a custodial, personal or financial relationship with the adoptee"  can be accomplished by seven specified, alternative means. Id.
{16} Mark registered with the putative father registry a few days after receiving notice of the adoption petition, which was about two months after the child's birth, thereby seemingly fitting within Section 32A-5-3(F)(1). At about the same time, he filed a paternity petition, which was one of the alternative means listed in Section 32A-5-3(F)(4)(a). Therefore, shortly after receiving the adoption petition, Mark apparently satisfied two statutory definitions of "acknowledged father."
{17} In their motion for rehearing, Petitioners argue that Mark could not have become an acknowledged father, whose consent was required, by registering with the putative father registry because he did not register within ten days of the child's birth, as required by Section 32A-5-19(E). That statute provides that consent is not required from "an alleged father who has failed to register with the putative father registry within ten days of the child's birth and is not otherwise the acknowledged father." § 32A-5-19(E). Petitioners contend that "[a]bsent some other ground establishing that the father is an `acknowledged father' under [Section] 32A-5-3(F) of the Act, registering as a putative father later than 10 days after the [birth] carries with it no right to veto the adoption." We agree with Petitioners' reading of Section 32A-5-19(E) and hold that Mark did not register in time to acquire acknowledged-father status via the putative father registry as provided in Section 32A-5-3(F)(1). Thus, as Petitioners note, in order to be deemed an acknowledged father, Mark had to satisfy one of the other grounds specified in Section 32A-5-3(F)(4). It appears that Mark did establish one of these grounds because he "initiated an action to establish paternity," as provided in Section 32A-5-3(F)(4)(a)(1).
{18} Petitioners also challenge this basis for acknowledged-father status. In their brief in chief and reply brief on appeal, Petitioners contended Mark was not an acknowledged father because he "did not establish that he met any of the . . . methods of becoming an acknowledged father prior to the time of placement or the time of filing of the Petition for Adoption." It appears Petitioners' argument is that acknowledged-father status must be established prior to the child's placement for adoption or, at minimum, prior to the filing of the adoption petition; otherwise, they contend, the putative father's consent is not required for the adoption to be finalized.
{19} We do not agree with Petitioners' interpretation of the statutory scheme for two reasons. First, there is nothing in Section 32A-5-36(C), which prescribes the determinations to be made when a putative father challenges an adoption, that ties a father's status for purposes of consent to a particular date or event. While it makes sense that finalization of an adoption would cut off any subsequent attempts to achieve acknowledged-father status, that is not the situation in the present case. Thus, Mark's status as an acknowledged father does not turn on whether he achieved that status prior to the time of placement or prior to the filing of the adoption petition; there is simply no such deadline within this statute.
{20} Second, Section 32A-5-3(F), which defines "acknowledged father," selectively imposes a time restriction on some, but not all, of the alternative circumstances for establishing acknowledged fatherhood. For example, in order to satisfy the second of the seven alternatives listed in Subsection (F)(4)(a), the putative father must be "living with the adoptee at the time the adoption petition is filed." § 32A-5-3(F)(4)(a) (emphasis added). Similarly, to satisfy the third alternative in Subsection (F)(4)(a), the father must "[have] lived with the mother a minimum of ninety days during the two-hundred-eighty-day-period *104 prior to the birth or placement of the adoptee." Id. (emphasis added). Thus, the legislature placed time limitations on some of the alternative circumstances leading to acknowledged-father status and chose to place no limit on the alternative applicable in the present case: initiation of a paternity action in accordance with the first alternative listed under Section 32A-5-3(F)(4)(a).
{21} In their motion for rehearing, Petitioners expand their argument and point to specific aspects of Section 32A-5-3(F)(4), which they contend establish that Mark's paternity petition was filed too late. They claim this is evidenced by the statute's use of the past tense (i.e., "has openly held out" and, in Subsection (F)(4)(a)(1), "has initiated an action"), and the fact that all other alternative ways of achieving acknowledged-father status under Subsection (F)(4)(a) "uniformly require[ ] that a relationship has been established prior to the filing of the adoption petition." We are not persuaded. The statute does not tie its use of the past tense to any particular event, such as the filing of the adoption petition. And, as we previously noted, the fact that the initiation of a paternity suit is the only alternative without a specific time limit suggests that the legislature knew how to impose time limits and purposely omitted the limits with respect to the alternative related to initiation of a paternity action.
{22} Also in their motion for rehearing, Petitioners argue that our recognition of Mark's status as an acknowledged father is inconsistent with Section 32A-5-36(C), which establishes the procedures a district court must follow if a person claiming to be the biological father appears in an adoption proceeding and files "a written petition or response seeking custody and assuming financial responsibility of the adoptee." Section 32A-5-36(C) requires the district court to first determine if the purported father is indeed the biological father and, if so, to then determine "whether the person qualifies as a presumed or acknowledged father whose consent is necessary for adoption." Consequently, Petitioners argue,
[i]f a biological father's mere filing of a petition to establish paternity in response to a petition for adoption was alone sufficient to meet the definition of "an acknowledged father whose consent is required," . . . the second step of the inquiry provided for in [Section] 32A-5-36(C) would become entirely superfluous. Every biological father who appears in an adoption proceeding, without exception, would become, as a matter of law, "an acknowledged father whose consent for adoption is required."
{23} We disagree. Not every purported biological father who appears in an adoption proceeding will file a motion to establish paternity, as Mark did here. We also do not agree that our holding renders superfluous the two-step determination required by Section 32A-5-36(C). While the filing of a paternity petition may give a petitioner automatic acknowledged-father status, thereby satisfying the second step of the district court's determination, if the court determined that the petitioner was not the adoptee's biological father, the first step would not be satisfied, and the district court would have to dismiss the petition.
{24} In our view, the legislature has determined that an adoption may not be finalized without a biological father's consent if the father seeks to shoulder parental responsibility by requesting a paternity determination in the context of the adoption litigation. Thus, as long as he is indeed the biological father, the adoption cannot take place without his consent. We do not agree with Petitioners that our interpretation of the statutory scheme is inconsistent with the legislature's policy of "encourag[ing] expeditious and uncomplicated adoptions." We believe the Act strives to balance this policy goal with the goal of providing an unwed father the opportunity to commit to responsible parenthood and participate in his child's rearing. See Lehr v. Robertson, 463 U.S. 248, 262, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) ("When an unwed father demonstrates full commitment to the responsibilities of parenthood by com[ing] forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the *105 due process clause." (internal quotation marks and citation omitted; alteration in original)). We are not persuaded that the legislature intended to favor expeditious adoptions at the expense of a biological father's rights.
{25} Petitioners further contend Mark's consent was not required because the district court concluded as much. Petitioners rely on the following conclusions of law:
1. [The child] is the biological child of Mark . . ., which was determined by DNA testing after the Petition for the Adoption of [the child] was initiated.
2. At all times prior to Mark['s] . . . paternity test he was an "alleged father".
3. The [child's] birth mother placed him for adoption with a licensed agency, as defined [by] NMSA [1978, § 3]2A-5-3(D).
4. A Court Order for Adoption is not required when the proceedings are conducted by a licensed agency.
5. For purposes of adoption, New Mexico Law does not require the consent of an "alleged father". [§] 32A-5-17(A).
6. For purposes of adoption, New Mexico Law requires notice to "acknowledged" fathers.
7. [The adoption agency] had not received confirmation that Mark . . . was the biological father at any point prior to the pre-adoption placement of [the child].
8. [The adoption agency] made reasonable efforts to contact [Mark], although he was "alleged" and not an "acknowledged father" or "presumed father".
9. The pre-adoption placement of [the child] was done properly.
Thus, Petitioners claim the district court found Mark to be an "alleged father" whose consent was not required.
{26} The Act defines an "alleged father" as "an individual whom the biological mother has identified as the biological father, but the individual has not acknowledged paternity or registered with the putative father registry as provided for in Section 32A-5-20." § 32A-5-3(G). And, as we noted above, Section 32A-5-19(E) states that consent to adoption is not required from "an alleged father who has failed to register with the putative father registry within ten days of the child's birth and is not otherwise the acknowledged father."
{27} Petitioners are correct that the district court concluded Mark was an alleged father. But the district court also appears to have concluded that Mark was an alleged father only for a limited time because it stated that "[a]t all times prior to Mark['s] . . . paternity test he was an `alleged father'." This conclusion implies that Mark's status changed after his paternity test. This implication is consistent with Mark's becoming an "acknowledged father" under Section 32A-5-3(F)(4)(a), once he initiated his paternity petition.
{28} As for the remaining conclusions of law quoted above, they appear to be directed at issues that were contested below but not on appeal: whether the agency complied with statutory requirements when it placed the child with Petitioners and whether Mark received proper notice of the adoption proceeding. The district court ultimately concluded that everything was done appropriately, and the parties do not dispute this on appeal. We do not agree with Petitioners that the district court concluded that Mark's consent was never required, even after he attained acknowledged-father status by filing a paternity petition. If the adoption could have proceeded without Mark's consent, there would have been no need to litigate the issue of whether Mark's parental rights should be terminated due to his alleged presumptive abandonment of the child.
{29} We conclude that Mark's filing of a paternity petition while the adoption proceeding was pending established his status as an acknowledged father according to the plain language of the Act's relevant provisions. As a result, his consent to the adoption was necessary. Because Mark did not consent to the adoption, Petitioners sought and obtained termination of his parental rights under the presumptive abandonment statute. § 32A-5-15(B), (C); see In re Adoption of J.J.B., 119 N.M. at 643, 894 P.2d at 999 ("Termination of parental rights eliminates the need for that parent's consent to any proposed adoption."). We therefore turn *106 to an analysis of that statute and the district court's determination.
2. Whether Clear and Convincing Evidence Supported the District Court's Finding That Mark Presumptively Abandoned the Child
{30} We review the district court's findings of presumptive abandonment to determine whether they are supported by substantial clear and convincing evidence, In re Adoption of J.J.B., 119 N.M. at 656, 894 P.2d at 1012 (Franchini, J., dissenting), which is evidence that "instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." State ex rel. Children, Youth & Families Dep't v. Joseph M., 2006-NMCA-029, ¶ 15, 139 N.M. 137, 130 P.3d 198 (internal quotation marks and citation omitted). We view the evidence in the light most favorable to Petitioners, who were the prevailing parties below. In re Adoption of Doe, 89 N.M. 606, 619-20, 555 P.2d 906, 919-20 (Ct.App.1976). We review de novo the district court's application of the law to the facts. State v. Notah-Hunter, 2005-NMCA-074, ¶ 5, 137 N.M. 597, 113 P.3d 867.
{31} Subsection B of the statute governing termination of parental rights provides three circumstances under which parental rights shall be terminated. The one relevant to this case is as follows:
(3) [T]he child has been placed in the care of others, including care by other relatives, either by a court order or otherwise, and the following conditions exist:
(a) the child has lived in the home of others for an extended period of time;
(b) the parent-child relationship has disintegrated;
(c) a psychological parent-child relationship has developed between the substitute family and the child;
(d) if the court deems the child of sufficient capacity to express a preference, the child no longer prefers to live with the natural parent;
(e) the substitute family desires to adopt the child; and
(f) a presumption of abandonment created by the conditions described in Subparagraphs (a) through (e) of this paragraph has not been rebutted.
§ 32A-5-15(B)(3)(a)-(f). Section 32A-5-15(C) then provides that "[a] finding by the court that all of the conditions set forth in Subparagraph (a) through (e) of Paragraph (3) of Subsection B of this section exist shall create a rebuttable presumption of abandonment."
{32} At trial, Mark stipulated that all elements of presumptive abandonment exist except Subparagraph (b), "the parent-child relationship has disintegrated." Mark contended below and on appeal that he had nothing to do with the disintegration of his relationship with the child because (1) he did not know that Helen was pregnant or that the child existed until he received notice from the adoption agency; and (2) he did nothing to cause disintegration of the relationship, and in fact he has done everything possible to nourish the relationship since the child's birth. With respect to Mark's first contention, the district court found that Mark "knew or should have known that he fathered a child with [Helen]," and we have concluded that substantial evidence supported this finding. We therefore consider Mark's second point.
{33} Our Supreme Court addressed the requirements of the presumptive abandonment statute in In re Adoption of J.J.B. and stated:
[W]e have emphasized that two factors must both be established to prove abandonment: (1) parental conduct evidencing a conscious disregard of obligations owed to the child, and (2) this conduct must lead to the disintegration of the parent-child relationship. We emphasize that both factors must be established to prove abandonment, and that evidence of the disintegration of the parent-child relationship is of no consequence if not caused by the parent's conduct.
119 N.M. at 648, 894 P.2d at 1004. Thus, the party seeking termination of parental rights (in this case, Petitioners) has the burden of proving "that the objective parental conduct [is] the cause of the destruction of the parental-child *107 relationship." Id. at 649, 894 P.2d at 1005. Further, the presumption of abandonment arising from proof of the factors listed in Section 32A-5-15(B)(3) "is completely rebutted by showing that a parent lacks responsibility for the destruction of the parent-child relationship." In re Adoption of J.J.B., 119 N.M. at 649, 894 P.2d at 1005.
{34} Petitioners claim they proved that Mark's objective conduct resulted in the destruction of his relationship with the child. They point to evidence that Mark knew or should have known that Helen was pregnant and yet failed to provide Helen with any financial or emotional support during her pregnancy. In fact, they argue, Mark failed to do anything to establish a relationship with the child until after he received notice of the pending adoption petition.
{35} It is true that Mark did nothing during Helen's pregnancy that would indicate he intended to shoulder any parental responsibilities. However, as we read the presumptive abandonment statute and In re Adoption of J.J.B., Mark's failure to act prior to the child's birth in this case could not have "cause[d] . . . the destruction of the parental-child relationship." Id.
{36} We first consider what is meant by the language of Section 32A-5-15(B)(3)(b), that "the parent-child relationship has disintegrated." "We give the words of a statute their ordinary meaning in the absence of clear and express legislative intent to the contrary." Fernandez v. Espanola Pub. Sch. Dist., 2005-NMSC-026, ¶ 3, 138 N.M. 283, 119 P.3d 163.
{37} The ordinary meaning of the statute contemplates a relationship that already exists, because one that does not yet exist cannot "disintegrate." Petitioners' arguments and the district court's findings focus on Mark's failure to act prior to the child's birth. But this perspective does not logically fit within the ordinary meaning of the statutory words. Mark could not have a "relationship" with the child in utero, and there was therefore no relationship that could be subject to disintegration until the child was born.
{38} In their motion for rehearing, Petitioners point out that the statutory definition of an acknowledged father provides for the establishment of a relationship with a child before it is born. Section 32A-5-3(F)(4)(a)(5) provides that an acknowledged father includes one who "has openly held out the adoptee as his own child by establishing a custodial, personal or financial relationship with the adoptee" by "provid[ing] reasonable and fair financial support to the mother during the pregnancy and in connection with the adoptee's birth in accordance with his means." We agree with Petitioner that a father can establish a pre-natal relationship with a child in this way. However, a father's failure to establish a relationship in this specific way does not mean that he has engaged in objective conduct causing the destruction of the parent-child relationship. In theory, a father who first established a relationship by supporting the mother through her pregnancy and the child's birth could be subject to the abandonment presumption of Section 32A-5-15(B) if he then repudiated the child, refused to visit the child, and failed to support the child. But that is not the situation in the present case. Here, Mark's failure to support Helen during her pregnancy means only that he denied himself the opportunity of attaining acknowledged-father status via this particular statutory option; instead, he attained that status by filing a paternity petition.
{39} While we agree with Petitioners that sound morals should compel a prospective father to provide indirect support to a fetus by assisting the mother during her pregnancy, our statute does not require him to do so. This contrasts with statutes in other states that specifically permit courts to consider a father's lack of support of a mother during her pregnancy when considering whether the father is entitled to notice of adoption proceedings or whether he has abandoned the child. See, e.g., Ala.Code § 26-10A-9(a)(1) (1992) (providing that pre-birth abandonment constitutes implied consent to adoption); Idaho Code Ann. § 16-1504(2)(b)(iii) (Supp.2005) (stating that a father of a child born out of wedlock is not a necessary party if he did not provide financial support for the pregnancy and birth under certain circumstances); N.C. *108 Gen.Stat. § 48-3-601(2)(b)(1)-(4) (2005) (similar to Idaho statute). If our legislature is so inclined, it can require putative fathers to do more prior to a child's birth in order to seize the opportunity of developing a parent-child relationship. See Lehr, 463 U.S. at 262, 103 S.Ct. 2985 ("The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development." (footnote omitted)). Until the legislature does so, however, we must apply the statute as it is now written. See Torres v. State, 119 N.M. 609, 612, 894 P.2d 386, 389 (1995) (stating that "it is the particular domain of the legislature, as the voice of the people, to make public policy").
{40} According to Section 32A-5-15(B)(3)(b), Mark could not have "cause[d] . . . the destruction of the parental-child relationship," In re Adoption of J.J.B., 119 N.M. at 649, 894 P.2d at 1005, until there was a relationship in existence to destroy, which in this case means until after the child was born. This being the case, the district court should have focused on Mark's post-birth "objective parental conduct." Id. We conclude the district court improperly focused on Mark's pre-birth conduct, and thus, the court's finding that Mark presumptively abandoned the child is not supported by substantial evidence.
{41} Of the findings made by the district court regarding Mark's conduct, none refers to his conduct after the child's birth. One finding could perhaps be viewed as a statement about Mark's post-birth conduct by implication: "From the time of the [child's] birth until Mark . . . was served notice of the adoption proceedings, the [child's] needs of maintenance, nurturing, guidance, love and affection were met by the Petitioners." However, proving the relationship-disintegration element of presumptive abandonment requires more than such a vaguely implied suggestion that the parent somehow failed to assume the responsibilities of parenting. See id. at 648, 894 P.2d at 1004 (stating that "we have adopted an objective evidentiary definition of abandonment that focuses on the effect of the parent's conduct on the child"). The court's other findings regarding post-birth events relate to other elements of presumptive abandonment, such as the child's residing with Petitioners for an extended period of time, § 32A-5-15(B)(3)(a), and formation of a psychological bond with Petitioners, § 32A-5-15(B)(3)(c), which are not at issue.
{42} The district court made a conclusory finding that "[t]here is no parent[-]child relationship or bond between the biological father and the [child]." While this statement may accurately reflect the circumstances, it underscores the fact that if a parent-child relationship did not exist, Mark could not have caused its disintegration.
{43} In addition, far from showing conduct that Mark caused disintegration of the parent-child relationship, the evidence instead showed that Mark attempted to establish a relationship with the child and had begun to forge a bond or attachment with the child through the visitation ordered by the court. Within three months of the child's birth, Mark registered with the putative father registry, filed a paternity suit, responded to Petitioners' adoption petition, and requested visitation. The family intervention specialist who supervised Mark's visitation with the child testified that the transition from Petitioners to Mark went smoothly and she detected no anxiety in the child during visitation. She observed the child stretching out his arms to Mark and greeting Mark with a big grin, and she noticed that when the child left the room, the child looked around for Mark. The child was very comfortable with Mark, which to her, was attachment. Petitioners cannot point to any post-birth conduct of Mark that caused the destruction of his relationship with the child, and the district court found none. Petitioners failed to prove the elements of presumptive abandonment, and we therefore reverse the district court's termination of Mark's parental rights.
{44} Finally, we similarly reject Helen's contention, in a brief she filed in support of Petitioners, that Mark's failure to support her pregnancy constitutes abandonment. In *109 support of this contention she cites three out-of-state cases, which do not stand for the proposition she argues and which are distinguishable from the present case. In re Paternity of Baby Doe involved the interpretation of an Indiana statute expressly providing that failure to register with the Indiana putative father registry within 30 days of a child's birth or the filing of the adoption petition waives notice of adoption proceedings and that such waiver "constitutes the man's irrevocably implied consent to the child's adoption." 734 N.E.2d 281, 283-85 n. 6 (Ind.Ct. App.2000) (quoting Ind.Code § 31-14-20-2 (1997)). Our statutes have no comparable provisions. Similarly, In re Termination of Parental Rights Over Baby Boy K. involved the constitutionality of statutory time limits cutting off a putative father's entitlement to notice of adoption proceedings. 546 N.W.2d 86, 90-91 (S.D.1996). Again, our statutes impose no time limits on the specific method Mark employed to attain acknowledged-father status, and notice of the adoption is not at issue in this case. And In re Adoption of S.J.B. concerned the constitutionality of a statute providing that notice need not be given to a putative father who has done nothing at all to grasp the opportunity to parent. 294 Ark. 598, 745 S.W.2d 606, 607-08 (1988), superseded by statute as stated in R.N. v. J.M., 347 Ark. 203, 61 S.W.3d 149 (2001). In the present case, by contrast, Mark initiated a paternity action, and, in doing so, became an acknowledged father whose consent to the adoption was required.
3. Remand for Custody Determination
{45} We recognize that our holding will have a powerful impact on the lives of the parties and, most dramatically, on the life of the child. Our Supreme Court wisely recognized that restoring parental rights, as we have done here, "does not mechanically result in the award of custody to the biological parents. The termination of parental rights and the determination of custody are different issues and must be addressed separately." In re Adoption of J.J.B., 119 N.M. at 651, 894 P.2d at 1007. Thus, as the Court did in In re Adoption of J.J.B., we remand this case to the district court for a determination of who should have custody of the child as prescribed by Section 32A-5-36(H), which provides:
H. If the court determines that any of the requirements for a decree of adoption pursuant to provisions of Subsections E and F of this section have not been met or that the adoption is not in the best interests of the adoptee, the court shall deny the petition and determine, in the best interests of the adoptee, the person who shall have custody of the child.
Although the district court made a determination at the time of the judgment that "[i]t is in the best interest of [the child] to remain with the Petitioners[,]" that determination was made in connection with the elements required for granting an adoption petition, Section 32A-5-36(F)(7) (requiring the court to find as a prerequisite to adoption that "the best interests of the adoptee are served by the adoption"), not in regard to the custody decision that must be made when an adoption decree has been reversed. Consequently, the district court is required to revisit the issue on remand and consider the factors informing the custody decision, as discussed in In re Adoption of J.J.B., 119 N.M. at 651-55, 894 P.2d at 1007-11. Because Helen never relinquished her parental rights, she is potentially eligible to have custody as well.
{46} The factors the district court must consider specifically include Mark's and/or Helen's fitness to parent and "whether there is clear and convincing evidence of gross misconduct such as incapacity, moral delinquency, instability of character, or inability to provide [the child] with needed care." Id. at 654, 894 P.2d at 1010. In addition, the district court "should determine whether, taking into account all factors, [Mark and/or Helen are] capable of reestablishing a healthy parent-child bond with [the child]." Id. The court may consider all possible options, and we encourage the court to make use of mediation in making its determination. See id. at 651-55, 894 P.2d at 1010-11 (discussing the various possible arrangements that may be considered in determining custody). And, as our Supreme Court noted in In re Adoption of J.J.B., "in resolving the best interests of [the child], the [district] court should not be bound by the traditional bright *110 line solution of awarding the child like a trophy to whichever party wins the litigation. The child's best interests may be served by applying more equitable principles." Id. at 654, 894 P.2d at 1010.
CONCLUSION
{47} For the foregoing reasons, we reverse the district court's judgment terminating Mark's parental rights and allowing Petitioners' adoption of the child to proceed. We remand for a determination of who should have custody of the child.
{48} IT IS SO ORDERED.
WE CONCUR: JAMES J. WECHSLER and MICHAEL E. VIGIL, Judges.
NOTES
[1] The legislature created the putative father registry "to protect the parental rights of fathers who affirmatively assume responsibility for children they may have fathered and to expedite adoptions of children whose biological fathers are unwilling to assume responsibility for their children by registering with the putative father registry or otherwise acknowledging their children." NMSA 1978, § 32A-5-20(A) (1993).