2008-NMSC-002

175 P.3d 914

In the Matter of the Adoption Petition of Bobby Antonio R. and Rosario R.

HELEN G., Biological Mother–Petitioner,

v.

MARK J.H., Biological Father–
Respondent,

and

Bobby Antonio R. and Rosario R.,
Petitioners–Respondents.

In the Matter of the Adoption Petition of Bobby Antonio R. and Rosario R.

Helen G., Biological Mother–Respondent,

v.

Mark J. H., Biological Father–
Respondent,

and

Bobby Antonio R. and Rosario R.,
Petitioners–Petitioners.

Nos. 30,021, 30,027.

Supreme Court of New Mexico.

Nov. 26, 2007.

Rehearing Denied Jan. 14, 2008.

Lauren M. Baldwin, Albuquerque, NM, for Biological Mother.

Jane Bloom Yohalem, Santa Fe, NM, Atencio Law Office, P.C., Harold O. Atencio, Albuquerque, NM, for Petitioners.

Mark J. Huddleston, Pro Se.

## OPINION

BOSSON, Justice.

{1} In interpreting our Adoption Act, NMSA 1978, §§ 32A–5–1 to –45 (1993, as amended through 2005), we determine for the first time what actions an unwed biological father must take, and when he must take them, to qualify as an "acknowledged father" under the Act, making his consent a prerequisite to the adoption of his child. Section 32A–5–17(A)(5) ("Consent to adoption ... shall be required of ... the adoptee's acknowledged father."). Our interpretation of the Adoption Act draws upon the language of the section at issue in this appeal, and upon the language of the statute as a whole, as well as evidence of the Legislature's purpose in enacting the statute. After reviewing evidence of text and purpose alike, we hold that the father's consent to adoption was not required in this case because he never became an "acknowledged father" under the Act. Although the father knew the biological mother was pregnant, he did not register his paternity within the time frame set forth in Section 32A–5–19(E), nor did he file a paternity action in a timely fashion consistent with the requirements of Section 32A–5–3(F)(4)(a). The Court of Appeals having held otherwise, we reverse and remand to the district court for further proceedings to finalize the child's adoption.

## BACKGROUND

{2} From January 2003 through June 2003, Helen and Mark [1] were involved sexually, and they did not use birth control. In June 2003, Helen suspected she was pregnant. Although Mark denies being aware of the pregnancy, the district court found that Mark "knew or should have known that he fathered a child with [Helen]." The court drew this conclusion from testimony that Helen had told Mark several times of her suspected pregnancy, that Mark saw Helen at a time when her pregnancy would have been visible, and that Mark told a friend that he was aware of Helen's pregnancy, although he was not certain that he was the father of the child. The district court also found that Helen attempted to contact Mark after confirming her pregnancy, but to no avail. Significantly, Mark admitted that he changed his routine to avoid encountering Helen at work. After reviewing the record, we agree with the Court of Appeals that substantial evidence supports the district court's findings, and its conclusion that Mark "knew or should have known that he fathered a child with [Helen]." *In re Adoption of Romero*, 2006–NMCA–136, ¶ 4, 140 N.M. 618, 145 P.3d 98.

{3} Despite being aware of the pregnancy, Mark never acknowledged that Helen was pregnant with his child nor did he ever provide Helen with emotional or financial support during or after her pregnancy. Ultimately, Helen decided to put her child up for adoption. Three days after birth, the child was placed with the adoptive parents through the efforts of a licensed adoption agency. Two months later, on April 19, 2004, the adoptive parents filed their petition to adopt the child. By that time, two months after the birth of his child, Mark still had not acknowledged or attempted to acknowledge paternity.

{4} At the time the adoption petition was filed, the adoption agency sent five letters to Mark, each to a different address, to inform him of the adoptive placement and the agency's intention to terminate any rights he may have as the biological father. Three letters were returned, one was unaccounted for, and one was opened by Mark's wife. Upon receipt of the letter, Mark called the adoption agency to set up an appointment to contest the adoption. He hired an attorney and registered with the putative father registry, a statutory device designed to protect the

1. In keeping with the Court of Appeals opinion, we refer to the biological mother as either "mother" or "Helen" and the biological "father" as "Mark." The Romeros, who adopted their child, will be referred to as the "adoptive parents."

parental rights of fathers. *See* § 32A–5–20. In response to the Adoption Petition and Petition to Terminate Biological Father's Rights, Mark filed a motion on April 30, 2004, seeking to establish paternity and, if he were found to be the biological father, requested "reasonable visitation" with his son and "proper Notice under the [New Mexico] Adoption Code."

{5} Both before the district court and now on appeal, Helen and the adoptive parents have opposed Mark's claim to "acknowledged father" status which under the Act would afford him the right to withhold consent to the adoption. *See* § 32A–5–17(A). Helen and the adoptive parents have further argued that even if Mark does fit the definition of "acknowledged father," he effectively abandoned the child by ignoring the needs of both mother and child during and after pregnancy. *See* § 32A–5–15(B)(1).

{6} The district court agreed with both positions taken by Helen and the adoptive parents. On appeal, the Court of Appeals found Mark's position more persuasive and, in a careful analysis of statutory intent, reversed the district court on both grounds. *See In re Adoption of Romero*, 2006–NMCA– 136, 140 N.M. 618, 145 P.3d 98. We granted certiorari to address important legal issues raised for the first time concerning our Adoption Act that may impact adoptions throughout the state. Concluding that Mark did not take sufficient, timely steps under the Act to earn the status of "acknowledged father," we now reverse the Court of Appeals. Because we hold that Mark is not an "acknowledged father," and thus has no statutory right to withhold consent to the adoption, it is not necessary that we reach the issue of abandonment; therefore we express no views in this opinion.

## STANDARD OF REVIEW

{7} "Adoption, unknown at common law, is a creature of statute." *Poncho v. Bowdoin*, 2006–NMCA–013, ¶ 19, 138 N.M. 857, 126 P.3d 1221. In New Mexico, adoption is governed by the Adoption Act, the interpretation of which is an issue of law we review de novo. *See Hovet v. Allstate Ins. Co.*, 2004–NMSC–010, ¶ 10, 135 N.M. 397, 89 P.3d 69.

## DISCUSSION

{8} The Adoption Act does not afford all biological fathers the right to consent to the adoption of their biological child. Rather, this right is granted only when a biological father takes additional steps to qualify either as a "presumed father" or an "acknowledged father" under the Act. Section 32A–5–17(A)(4), (5).

{9} A man can be a presumed father only through a marital relationship with the biological mother, even if the marriage is found to be invalid. *See* § 32A–5–3(V)(1)– (3). Mark does not qualify as a presumed father because he did not marry or attempt to marry Helen. Therefore, if Mark's consent is necessary for the adoption to proceed, he must demonstrate that he is an "acknowledged father" under the Act.

{10} Section 32A–5–3(F) defines an "acknowledged father" in several ways, only two of which are relevant to Mark's situation. A biological father becomes an acknowledged father as defined in Section 32A–5–3(F)(1) if he "acknowledges paternity of the adoptee pursuant to the putative father registry, as provided for in Section 32A–5–20." Or, a biological father becomes an acknowledged father as defined by Section 32A–5–3(F)(4) if he "has openly held out the adoptee as his own child by establishing a custodial, personal or financial relationship with the adoptee." We first briefly discuss Section 32A–5– 3(F)(1) (putative father registry), and then turn our attention in more detail to Section 32A–5–3(F)(4).

**Does Mark have the right to consent arising from his registration with the putative father registry?**

{11} A father may become an "acknowledged father" if he "acknowledges paternity of the adoptee pursuant to the putative father registry." Section 32A–5–3(F)(1). The Adoption Act established the putative father registry within the state department of health to provide a means for unwed, biological fathers to document their intent to claim paternity. Section 32A–5–20. Their consent to adoption, however, "shall not be required"

if the biological father has "failed to register with the putative father registry within ten days of the child's birth and is not otherwise the acknowledged father." Section 32A–5–19(E). Mark did register with the putative father registry shortly after receiving notice of the pending adoption, but not until approximately two months after the child's birth and placement with the adoptive parents. Helen and the adoptive parents assert that "Mark could not have become an acknowledged father, whose consent was required, by registering with the putative father registry because he did not register within ten days of the child's birth, as required by Section 32A–5–19(E)." *In re Adoption of Romero*, 2006–NMCA–136, ¶ 17, 140 N.M. 618, 145 P.3d 98.

{12} The Court of Appeals determined that the ten-day limit applies to Section 32A–5–3(F)(1), and Mark does not seem to dispute this point on appeal. *See In re Adoption of Romero*, 2006–NMCA–136, ¶ 17, 140 N.M. 618, 145 P.3d 98. However, Section 32A–5–3(F)(1) does not use the same ten-day language as Section 32A–5–19(E), and therefore we must satisfy ourselves independently that the parties are correct.

{13} When interpreting a statute "we must read different legislative enactments as harmonious instead of as contradicting one another." *Luboyeski v. Hill*, 117 N.M. 380, 384, 872 P.2d 353, 357 (1994). Section 32A–5–3(F)(1), the definitions section of the Adoption Act, defines "acknowledged father" in general terms, compliance with the putative father registry, but makes no mention of when the father actually registers. Section 32A–5–19 of the Act, on the other hand, specifically addresses consent, including when the father's consent is not required for an adoption, namely when the father does not register within ten days of the child's birth.

{14} Reading the two sections together, it is apparent that biological fathers who do no more to become "acknowledged fathers" than file with the putative father registry must do so in a timely fashion, within ten days of the child's birth. If they do not register in a timely fashion, biological fathers may have other rights under the Act, but not the specific right to withhold "consent to

adoption" under Section 32A–5–19. Accordingly, we affirm the Court of Appeals on this point, and now turn to a specific discussion of Section 32A–5–3(F)(4) to determine if Mark is an "otherwise ... acknowledged father" entitled to the right to consent. Section 31A–5–19(E).

## Is Mark an "acknowledged father" under Section 32A–5–3(F)(4)?

{15} For our review, we include the language of Section 32A–5–3(F)(4)(a):

F. "[A]cknowledged father" means a father who:

. . .

(4) has openly held out the adoptee as his own child by establishing a custodial, personal or financial relationship with the adoptee as follows:

(a) for an adoptee under six months old at the time of placement: 1) has initiated an action to establish paternity; 2) is living with the adoptee at the time the adoption petition is filed; 3) has lived with the mother a minimum of ninety days during the two-hundred-eighty-day-period prior to the birth or placement of the adoptee; 4) has lived with the adoptee within the ninety days immediately preceding the adoptive placement; 5) has provided reasonable and fair financial support to the mother during the pregnancy and in connection with the adoptee's birth in accordance with his means and when not prevented from doing so by the person or authorized agency having lawful custody of the adoptee or the adoptee's mother; 6) has continuously paid child support to the mother since the adoptee's birth . . .; or 7) any other factor the court deems necessary to establish a custodial, personal or financial relationship with the adoptee.

{16} Section 32A–5–3(F)(4)(a)(2)–(7) do not apply to Mark. We are interested, therefore, in Section 32A–5–3(F)(4)(a)(1), enabling a father to achieve "acknowledged father" status if he "has initiated an action to establish paternity." We now examine the language of Section 32A–5–3(F)(4) to determine if that section clearly evinces a legislative intent to

allow a father in Mark's situation to be considered an "acknowledged father."

{17} In response to the adoption petition filed two-and-a-half months after his child's birth, Mark did file a motion in the adoption proceeding seeking to establish paternity by court-ordered DNA testing. However, Section 32A–5–3(F)(4)(a)(1) specifically states that the biological father must have "*initiated* an action to establish paternity." (Emphasis added.) An action to establish paternity is a separate civil action governed by the Rules of Civil Procedure. NMSA 1978, § 40–11–14 (1997). Mark never initiated a separate civil action in district court to establish paternity. More is required, it would appear from the statute, than merely filing a responsive motion in an adoption proceeding, especially when Mark knew for months about the pregnancy and took no steps to establish paternity until more than two months after his child's birth.

{18} In addition, even if we were to overlook the lack of any separate action "initiated . . . to establish paternity," Helen and the adoptive parents contend that Mark's motion to establish paternity was not timely. They assert that to gain the protections of acknowledged father status, Mark needed to file a paternity action before the child was placed in an adoptive home, or at the very latest before the adoptive parents filed the adoption petition, which of course Mark did not do. Mark counters that Section 32A–5–3(F)(4)(a)(1) has no such time limit; it merely refers to a paternity action. Because Mark did in fact move to establish paternity, regardless of the timing, he asserts that that has established the "custodial, personal or financial relationship" with his child required to become an acknowledged father under the Act.

{19} Mark persuaded the Court of Appeals that his paternity effort was timely. Based on the "plain language" of the Act, the Court of Appeals concluded that "Mark's filing of a paternity petition [motion] while the adoption proceeding was pending established his status as an acknowledged father." *In re Adoption of Romero*, 2006–NMCA–136, ¶ 29, 140 N.M. 618, 145 P.3d 98. According to the Court of Appeals, "Mark's status as an ac-

knowledged father does not turn on whether he achieved that status prior to the time of placement or prior to the filing of the adoption petition; there is simply no such deadline within this statute." *Id.* ¶ 19. Based on his acknowledged father status, the Court concluded that Mark's consent to the adoption, withheld by Mark, was necessary to complete the adoption. *Id.* ¶ 29.

{20} Presumably, Mark's argument, as adopted by the Court of Appeals, would allow a biological father to initiate paternity proceedings at almost any time, no matter how late. However, we are not persuaded that the language of the Act evinces a clear intent to be that indulgent of fathers who appear to be indifferent to their children. Our conclusion is bolstered by an examination of the statute as a whole, which further demonstrates the Legislature's intent that a father attain "acknowledged father" status prior to the time of placement or the time of filing for adoption.

{21} We first observe that throughout Section 32A–5–3(F)(4)(a), the Legislature employs text that looks to the past actions of the father. Section 32A–5–3(F)(4) specifically requires that to be an acknowledged father, the father "*has* openly held out the adoptee as his own child by *establishing* a custodial, personal or financial relationship with the adoptee." (Emphasis added.) This reference to past actions frames every one of the six alternate criteria of Section 32A–5–3(F)(4)(a), and would also seem to apply to Section 32A–5–3(F)(4)(a)(1). The text of the entire section strongly suggests that a father's "custodial, personal or financial relationship" with his child must already be in existence by the time adoption proceedings have begun.

{22} Section 32A–5–3(F)(4)(a) lists the various ways in which a father can demonstrate this relationship that he has already formed. As discussed above, according to the definition of "acknowledged father" in Section 32A–5–3(F)(4)(a)(1), the biological father must have "initiated," i.e., already started, a separate civil action to be entitled to the right to consent. And while none of the additional alternatives found in Section 32A–5–3(F)(4)(a)(2)–(7) apply directly to Mark's

case, we look to them for context to aid us in determining what the Legislature intended when it drafted Section 32A–5–3(F)(4)(a)(1). Most of the other alternatives listed in Section 32A–5–3(F)(4)(a) use the past tense as well, e.g., *has* lived with the mother, *has* lived with the adoptee, *has* continuously paid child support. In other words, the statute directs the court to look at what the father *has* done to establish a "custodial, personal or financial relationship" with his child, not to what he might do in the future.

{23} Most of the factors included within Section 32A–5–3(F)(4)(a) refer to a specific point in time by which the father must have done the acts establishing a "custodial, personal or financial relationship." For example, the second alternative to Section 32A–5–3(F)(4)(a) requires that the biological father live "with the adoptee *at the time the adoption petition is filed.*" (Emphasis added.) Section 32A–5–3(F)(4)(a)(3) requires the father to have "lived with the mother a minimum of ninety days during the *two-hundred-eighty-day-period prior to the birth or placement of the adoptee.*" (Emphasis added.) The fourth alternative to Section 32A–5–3(F)(4)(a) states that the father must have "lived with the adoptee within the *ninety days immediately preceding the adoptive placement.*" (Emphasis added.) Each of these time limits imposed by the Legislature requires action by the biological father either prior to the placement of the adoptee or prior to the filing of the adoption petition.

{24} Moreover, while other alternatives in Section 32A–5–3(F)(4)(a) and its companion provision Section 32A–5–3(F)(4)(b) (governing adoptees "over six months old at the time of placement") do not list specific time limitations, they nevertheless do list several actions that must be taken *prior to the adoptive placement.* *See* § 32A–5–3(F)(4)(b)(2) (requiring that the "father have lived with the adoptee within the ninety days immedi-

ately preceding the adoptive placement"); § 32A–5–3(F)(4)(a)(6), (b)(3) (requiring the biological father to have continuously paid child support since the child's birth which would not be required after adoption).[2]

{25} The Court of Appeals noted these same time limitations found in Section 32A–5–3(F)(4)(a) and (b). *In re Adoption of Romero,* 2006–NMCA–136, ¶ 20, 140 N.M. 618, 145 P.3d 98. The Court concluded, however, that the time constraints demonstrated the Legislature's choice to put time limits on some of the alternatives and the concomitant choice "to place no limit on the alternative applicable in the present case: initiation of a paternity action in accordance with the first alternative listed under Section 32A–5–3(F)(4)(a)." *Id.* The Court continued, "the fact that the initiation of a paternity suit is the only alternative without a specific time limit suggests that the [L]egislature knew how to impose time limits and purposely omitted the limits with respect to the alternative related to initiation of a paternity action." *Id.* ¶ 21. Although we acknowledge the force of the Court's argument, we do not find the textual meaning so clear-cut.

■ {26} As a general rule, we avoid the temptation to read any one part of a statute "'in a vacuum,'" but rather consider such part "'in reference to the statute as a whole.'" *State v. Smith,* 2004–NMSC–032, ¶ 10, 136 N.M. 372, 98 P.3d 1022 (quoting 2A Norman J. Singer, *Statutes and Statutory Construction* § 46:05, at 165 (6th ed., rev. 2000)). Therefore, we review the entire section and indeed the entire Adoption Act as a whole to look for further indicia of the Legislature's intent.

{27} The different sections, as previously described, refer almost universally to action that must be taken early, before the initiation of adoption proceedings. Indeed, the Legislature specifically stated that the section applies to "adoptee[s] under six months old *at*

---

2. It is true that some of these alternatives may prove difficult, if not impossible, for a biological father to perform. For example, the mother may not want the biological father living with her or with her child. The Legislature seems to have anticipated these difficulties and has encouraged a biological father to provide "reasonable and fair financial support to the mother *during the*

*pregnancy* and in connection with the adoptee's birth," and thereby attain acknowledged status under the Act. Section 32A–5–3(F)(4)(a)(5) (emphasis added). As demonstrated in the record below, despite being aware of the pregnancy, Mark never extended or attempted to extend financial support to Helen.

*the time of placement."* Section 32A–5–3(F)(4)(a) (emphasis added). Thus, a rational reading of the statute's text suggests that the biological father must show that he "has openly held out the adoptee as his own child by establishing a custodial, personal or financial relationship with the adoptee," Section 32A–8–3(F)(4), by having "initiated an action to establish paternity," Section 32A–5–3(F)(4)(a)(1), *prior* to the adoptee being placed with the adoptive family, or at the latest, prior to filing the adoption petition.

{28} Different, yet related sections of the Adoption Act, lead us to the same conclusion—a father who has the opportunity to establish a "custodial, personal or financial relationship" with his child, and who chooses not to, must initiate his paternity action prior to the time the petition is filed. We have already referred to the requirement that a father register with the putative father registry, essentially a precursor to a paternity action, within ten days of the birth of the child. Section 32A–5–19(E). It defies logic that a father would be able to bypass that time-sensitive requirement, only to gain acknowledged father status months later by doing essentially the same thing, filing a paternity suit.

{29} Other portions of the Adoption Act, referring to procedures for filing the petition for adoption, are also instructive. Section 32A–5–25(A) states that, if the adoptee is under the age of one year, a petition "shall be filed within sixty days of the adoptee's placement." Section 32A–5–26 describes the contents of the petition, and specifically requires that the petition, filed within sixty days of placement, include the "names and addresses of all persons from whom consents . . . are required. . . ." Finally, Section 32A–5–27 of the Act specifies to whom notice of an adoption petition must be sent. It requires that the petition be served on "any acknowledged father of the adoptee." Section 32A–5–27(A)(3). Mere alleged (biological) fathers, however, "shall not" be served with the petition. Section 32A–5–27(B)(1).

{30} Read together, these procedural sections establish that, at least for an infant child, the acknowledged father must be known to the adoption petitioner within sixty days of the child's placement, so that the petitioner can include the acknowledged father's name in the adoption petition and serve the acknowledged father with process, as required by statute. If a biological father does not take action to become an acknowledged father before the adoption petition is filed, then by statute the petitioner has no obligation to include the name of the biological father in the petition or serve the biological father with the petition. Clearly then, the adoptive parents must know the identity of any acknowledged father *before* they can comply with the procedural requirements for filing the adoption petition. The logical sequence of these procedural sections is unmistakable, suggesting that a biological father must take action to become an acknowledged father *before* the adoption petition is filed.

{31} Similarly, Section 32A–5–36(C) of the Act governs biological fathers who intervene at the hearing on the adoption petition, who file a "written petition or response *seeking custody.*" Section 32A–5–36(C) (emphasis added). This Section directs the court to proceed incrementally, first to determine if the claimant is the biological father, and then to determine if the biological father "qualifies as a presumed or acknowledged father whose consent is necessary for adoption." *Id.* The final provision of Section 32A–5–36(C) states that if a court finds that a biological father is neither a presumed nor an acknowledged father, the court "shall adjudicate the person's rights pursuant to the provisions of the Adoption Act, [Section 32A–5–1]." Section 32A–5–36(C).

{32} We first consider whether requesting an adjudication of paternity qualifies a biological father as an acknowledged father whose consent is required pursuant to Section 32A–5–36(C). We conclude that a mere biological connection is insufficient to "qualify" as a presumed or acknowledged father—it is only the initial step toward acknowledged father status. Simply requesting an adjudication of biological fatherhood, as Mark did in this case, does not qualify Mark as an acknowledged father whose consent is required pursuant to this section. If seeking an adjudication on paternity alone

were sufficient to become an acknowledged father, then the incremental steps of the first several provisions of Section 32A–5–36(C) would be merged into one step, making the remaining steps superfluous. Automatically, a biological father would become the same as an acknowledged father, contrary to the clear text of Section 32A–5–3(F)(4)(a).

{33} We now examine the final provision of Section 32A–5–36(C) to evaluate whether it evinces a legislative intent that a biological father who has requested an adjudication of paternity is entitled to the right to withhold his consent to the adoption, despite the fact that he is neither a presumed nor an acknowledged father.

{34} The Adoption Act provides that consent is required from an acknowledged or presumed father. Section 32A–5–17(A)(4), (5). This Section of the statute does not require that consent be given by a biological father, based solely on his status as such. Further, fathers whose only claim to "acknowledged father" status is through the putative father registry are specifically excepted from the consent requirement if they fail to file with the registry within ten days of the child's birth. Section 32A–5–19(E). Because the final provision of Section 32A–5–36(C) specifically refers to the rights of those fathers who are neither presumed nor acknowledged, the consent requirement of Section 32A–5–17 does not apply. Therefore, we conclude that any rights referred to in the final provision of Section 32A–5–36(C) do not include the right to withhold consent to the adoption. As we have already established, the Act envisions more than a mere biological relationship before a father obtains a veto over an adoption.

{35} We conclude that the rights referred to in the final provision of Section 32A–5–36(C) do not include the right of a biological father to withhold consent to the adoption. However, when a biological father who does not have the right to withhold consent to the adoption *seeks custody* of the adoptee at the hearing on the adoption petition, the district court "shall adjudicate the person's rights." Section 32A–5–36(C). During the petition hearing, the district court must determine that the adoption is in the child's best interest, *see* Section 32A–5–36(H), before it can grant the adoption decree. If the district court judge determines that the adoption is in the best interest of the child, after considering evidence presented by a biological father to the contrary, the adoption may proceed. If the adoption proceeds, an adoption decree is issued which creates a legal relationship between the adoptive parents and the adoptee, effectively terminating the legal relationship between the biological parents and the adoptee. Section 32A–5–37(B). Therefore, once a district court judge determines that the adoption should be finalized, unless otherwise provided for by the parties to the adoption, the biological parents no longer retain rights in their child.

{36} In this case, Mark filed a motion to dismiss the adoption in which he sought custody of the child. At the hearing on the adoption petition, the district court judge allowed Mark to testify and to present and cross examine witnesses. Mark testified that he wanted custody of his son and that it was in his son's best interest to be returned to his family. The district court judge heard that evidence and decided that the adoption was nevertheless in the child's best interest. Because the adoption was in the child's best interest, the district court determined that the adoption should proceed and that Mark no longer retained rights with respect to his son.

### Does Mark have a right to consent arising from the purpose of the Act?

{37} Having considered the text of the statute, we are still left with considerable uncertainty over the timing required by Section 32A–5–3(F)(4)(a)(1), which allows a father to become an acknowledged father based on the act of "initiat[ing] an action to establish paternity." On the one hand, the Section does not stipulate a point in time by which the paternity action must be initiated. On the other hand, a broader view of the statute's text, both in this same definitions section and elsewhere, strongly suggests overarching legislative concerns that a man establish "acknowledged father" status early in the proceedings, at the latest before the

time when adoption proceedings have begun. In other words, the "plain meaning" of the text, Section 32A–5–3(F)(4)(a)(1), is not plain as suggested, and appears, at best, ambiguous.

{38} We are mindful of Justice Montgomery's wise counsel when, in a similar context, he noted that

> courts must exercise caution in applying the plain meaning rule. Its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning. In such a case, it can rarely be said that the legislation is indeed free from all ambiguity and is crystal clear in its meaning.

*State ex rel. Helman v. Gallegos*, 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994). In *State ex rel. Helman*, this Court concluded that in the face of such uncertainty "it is part of the essence of judicial responsibility to search for and effectuate the legislative intent—the purpose or object—underlying the statute." *Id.* Accordingly, we now turn for guidance to an examination of legislative purpose.

{39} At the outset of our discussion we are mindful of the Adoption Act's purposes as set forth by the Legislature. Section 32A–5–2 states:

> The purpose of the Adoption Act [32A–5–1 NMSA 1978] is to:
>
> A. establish procedures to effect a legal relationship between a parent and adopted child that is identical to that of a parent and biological child;
>
> B. provide for family relationships that will give the adopted child protection and economic security and that will enable the child to develop physically, mentally and emotionally to the maximum extent possible; and
>
> C. ensure due process protections.

To ensure that these purposes are met, the Act addresses the various elements of adoption, including the limited rights of unwed biological fathers with which we are con-

cerned in this appeal. *See* §§ 32A–5–3, – 36(C).

{40} Along with the statutory protections given to parents under the Act, we are aware that parental rights are to some degree constitutionally protected under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution. *See Lehr v. Robertson*, 463 U.S. 248, 256–57, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). However, there are limits to this protection. The "mere existence of a biological link," *id.* at 261, 103 S.Ct. 2985 does "not warrant the same degree of constitutional protection as a developed parent-child relationship in which an unwed father demonstrates a full commitment to the responsibilities of parenthood." *In re Adoption of J.J.B.*, 119 N.M. 638, 646, 894 P.2d 994, 1002 (1995) (discussing *Lehr*, 463 U.S. at 261–66, 103 S.Ct. 2985).

{41} In discerning legislative intent, we first note that in drafting Section 32A–5–3(F)(4), our Legislature utilized language from the United States Supreme Court opinion in *Lehr*, 463 U.S. at 262, 103 S.Ct. 2985. In 1985, shortly after *Lehr* was decided, the Legislature incorporated into the Adoption Act the phrase "significant custodial, personal, or financial relationship," used by the Supreme Court to describe those actions an unwed father must take to ensure protection of his parental rights. *Id.*

{42} Based on the decision by our Legislature to add this phrase to the Adoption Act, we agree with the adoptive parents that the phrase "custodial, personal or financial relationship" is a term of art. Laws 1985, ch. 194, § 7(A)(4)(b). "When a statute uses terms of art, we interpret these terms in accordance with case law interpretation or statutory definition of those words, if any." *Buzbee v. Donnelly*, 96 N.M. 692, 700, 634 P.2d 1244, 1252 (1981). There is no statutory definition given for this phrase in Section 32A–5–3, other than the alternatives listed to demonstrate that such a relationship exists. Given our Legislature's reliance on the language of *Lehr*, we now review the Supreme Court's discussion regarding the constitutional protections afforded biological fathers.

{43} In *Lehr*, the Supreme Court was tasked with deciding whether the notice provisions of New York's statutory adoption scheme "adequately protected [the father's] opportunity to form ... a [custodial, personal, or financial] relationship" with his child. 463 U.S. at 262–63, 103 S.Ct. 2985. The adoptee was two years old, and the biological father had never sought to establish a relationship with his child, personal or financial. *Id.* at 250–52, 103 S.Ct. 2985. Yet, after the adoption petition was filed, the father filed a paternity action. *Id.* at 252, 103 S.Ct. 2985. The New York court was aware of the paternity action but granted the adoption petition nonetheless. *Id.* at 253, 103 S.Ct. 2985. The United States Supreme Court noted that the father's act of filing a paternity action after the adoption proceeding was underway did not suffice to establish a "custodial, personal, or financial relationship" with the child. *Id.* at 262, 103 S.Ct. 2985. Thus, the biological father did not have a constitutionally protected parent-child relationship. *Id.* The Court further noted that "the right to receive notice was completely within [the father's] control" because he simply had to mail a postcard to the putative father registry to receive notice of the pending adoption. *Id.* at 264, 103 S.Ct. 2985. The Supreme Court, therefore, held that the New York procedures protected the father's opportunity to establish a relationship with his daughter. *Id.*

{44} The Court in *Lehr* stressed that "the mere existence of a biological link does not merit ... constitutional protection;" rather, the Constitution only protects the parental relationship that an unwed father has actively developed by "com[ing] forward to participate in the rearing of his child ... [and] act[ing] as a father." *Id.* at 261, 103 S.Ct. 2985 (quoted authority omitted); *see also Caban v. Mohammed,* 441 U.S. 380, 397, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (Stewart, J., dissenting) ("The mother carries and bears the child, and in this sense her parental relationship is clear. The validity of the father's parental claims must be gauged by other measures."). Thus, to have a constitutionally protected parental right, an unwed biological father must "participate" and "act" as a father. It is not enough for a biological father to assert parental rights based on blood alone. *Lehr,* 463 U.S. at 261–62, 103 S.Ct. 2985. Instead, a parent's rights with regard to a child are a function of the responsibilities that the parent has undertaken. *Id.* at 257, 103 S.Ct. 2985 ("[T]he Court has emphasized the paramount interest in the welfare of children and has noted that the rights of the parents are a counterpart of the responsibilities they have assumed.").

{45} While the constitutionality of our procedures is not at issue here, the *Lehr* court's reasoning is relevant to our present inquiry because of our Legislature's apparent reliance on the language in the *Lehr* opinion. The Court's discussion of the "custodial, personal, or financial" language, along with its facts, provides valuable insight into what our Legislature intended when it incorporated that language in Section 32A–5–3(F)(4).

{46} According to the Supreme Court in *Lehr,* waiting to initiate a paternity action until after the adoption proceeding has begun does not establish a custodial, personal, or financial relationship with the child. The Supreme Court in *Lehr* clearly intended for a biological father to demonstrate early his intention to act as a father, at the latest before adoption proceedings have begun. Indeed, it is difficult to see how a biological father could develop the kind of parent-child relationship envisioned in *Lehr* if he waits until after the child has been placed for adoption, or even more so if he waits until after the adoptive parents have initiated adoption proceedings. In sum, we do not think our Legislature intended to allow in this statute what the Supreme Court would not allow in *Lehr.*

{47} We acknowledge that often, as in this case, children are placed with adoptive parents very soon after birth. By statute, adoption proceedings must be initiated expeditiously. Section 32A–5–25(A) ("A petition for adoption shall be filed within sixty days of the adoptee's placement into the proposed adoptive home if the adoptee is under the age of one year."). A biological father may have little time to find out about the adoption placement and take the steps necessary to become an acknowledged father. In this way, Mark's situation is somewhat different

from that of the father in *Lehr* where the child was two years old, giving the father a longer time to establish a relationship.

{48} However, the Act provides several alternatives that demonstrate a "custodial, financial or personal relationship" without relying on time after the birth to do so. A father can file a paternity action at any time prior to the filing of the adoption petition. Section 32A–5–3(F)(4)(a)(1). As discussed earlier, he could provide financial support to the mother during pregnancy. Section 32A–5–3(F)(4)(a)(5). The Act even includes a broad catch-all provision allowing a biological father to take any other action prior to the filing of the adoption petition that the court "deems necessary to establish a custodial, personal or financial relationship with the adoptee." Section 32A–5–3(F)(4)(a)(7). Our Act, therefore, provides ample protection to fathers who do not have a long period of time to develop a relationship with their child.

{49} We are mindful of the fact that there may be biological fathers who do not know or who have no reason to know that they have fathered a child. In such a case, a father may not be able to take action prior to the filing of the adoption petition, because the petition may be the first notice he receives that a child has even been conceived. Additionally, there may be biological fathers whose offers of support are affirmatively rejected by the biological mother and who only receive notice of the pending adoption through the filing of the adoption petition. These situations present special statutory and constitutional considerations that are not present in this appeal.

{50} Finally, it is universally understood that time is of the essence in adoption matters when dealing with infants and very young children. *See generally* Laurence C. Nolan, *Preventing Fatherlessness Through Adoption While Protecting the Parental Rights of Unwed Fathers: How Effective Are Paternity Registries?*, 4 Whittier J. Child & Fam. Advoc. 289, 296 (Spring 2005) ("Placement should occur as early as possible so that the child and the adoptive parents may bond, especially if the child is a newborn. Thus, minimum delay in the adoption process and finality of adoption fosters the child's sense of well-being and adjustment."); Laura Oren, *Thwarted Fathers or Pop–Up Pops?: How to Determine When Putative Fathers Can Block the Adoption of Their Newborn Children*, 40 Fam. L.Q. 153, 188–89 (Summer 2006) ("[T]ime is even more of the essence for very young children.... This has led many states to impose rather short deadlines, and even to permit prebirth conduct alone to determine the rights of putative fathers."). The risks to young children are well documented when adoption proceedings are delayed; and, therefore, we assume the Legislature was aware of the problem when it enacted our Adoption Act. The Legislature's language demonstrates an intent to have those biological fathers who seek acknowledged status proceed with dispatch. We are aware of no countervailing policy, and none has been argued to us, why Section 32A–5–3(F)(4)(a)(1) regarding paternity actions would be designed to create such a gaping exception to the rule.

{51} We cannot agree with the interpretation of Section 32A–5–3(F)(4)(a)(1) put forth by the Court of Appeals. Having failed to act in a timely manner, Mark has not demonstrated that he has earned the status of "acknowledged father." Accordingly, his consent is not a precondition to adoption of the child. Having held that Mark's consent is not required, we need not answer the second question presented to us on appeal which is whether Mark's inaction during Helen's pregnancy led to a presumptive abandonment of the child.

**CONCLUSION**

{52} We reverse the Court of Appeals and affirm the ruling of the district court. We remand to the district court to proceed with the entry of the adoption decree.

{53} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PATRICIO M. SERNA, and PETRA JIMENEZ MAES, Justices.