PITTMAN, Judge.
This appeal arises out of paternity and adoption proceedings before the Lauder-dale Juvenile Court involving R.L. (“the child”), a child born to S.J.L. (“the mother”) out of wedlock. The primary question presented is whether the juvenile court correctly determined that A.D.S., a man who was shown to be the biological father of the child via paternity testing initiated well after the birth of the child, is a “putative father” under now repealed provisions of the Alabama Adoption Code, § 26-10A-1 et seq., Ala.Code 1975 (“the Adoption Code”), applicable in this case so as to have had only a conditional right to object to the proposed adoption of the child by A.L.P. and D.J.P. (“the intervenors”) upon compliance with pertinent provisions of the Putative Father Registry Act, Ala.Code 1975, § 26-10C-1 et seq. (“the PFRA”), or whether A.D.S. is instead a “presumed father” with an unconditional right under the Adoption Code to so object.
The record reveals that the child was born on March 28, 2008. Three days after his birth, he began residing in the home of the intervenors, who are the half brother of the mother and his wife. On April 15, 2008, the intervenors filed a petition in the Lauderdale Probate Court seeking to adopt the child. In response to the petition, the probate court issued an interlocutory order granting temporary custody of the child to the intervenors, and that court directed that notice of a final hearing to be held on April 6, 2009, just over one year after the child’s birth, be given by publication to the child’s “unknown father.”
In June 2008, A.D.S., claiming to be the child’s father, filed an objection to the intervenors’ adoption petition in the probate court. One month later, A.D.S. sued the mother in the juvenile court, seeking a declaration that he was the father of the child and that he should have physical and legal custody of the child. Upon the completion of genetic testing and the publication of results indicating that A.D.S. is the child’s biological father, *348 A.D.S. moved the juvenile court for an order transferring the adoption proceedings to the juvenile court; the mother moved to dismiss the father’s paternity action on the basis that he had not complied with the PFRA; and the intervenors sought leave to appear as parties in the paternity action and filed a complaint alleging that A.D.S. had not only failed to comply with the PFRA but also had given irrevocable implied consent to the child’s adoption by virtue of having abandoned the child by failing to provide the mother monetary or emotional support for six months preceding the child’s birth (see § 26-10A-9(a)(l), Ala.Code 1975). In March 2009, the probate court transferred the adoption action to the juvenile court. After an ore tenus proceeding at which the parties and various witnesses testified, the juvenile court entered a judgment declaring A.D.S. to be a putative father, not a presumed father, and stating that his failure to timely register as a putative father barred his objection to the proposed adoption; the paternity action was dismissed, and the adoption action was remanded to the probate court.
“ ‘The ore tenus rule provides that a trial court’s findings of fact based on oral testimony “have the effect of a jury’s verdict,” and that “[a] judgment, grounded on such findings, is accorded, on appeal, a presumption of correctness which will not be disturbed unless plainly erroneous or manifestly unjust.” Noland Co. v. Southern Dev. Co., 445 So.2d 266, 268 (Ala.1984). “The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.” Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986).’
“Ex parte Anonymous, 808 So.2d 542, 546 (Ala.2001). ‘The trial court’s judgment in cases where the evidence is heard ore tenus will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment.’ River Conservancy Co., L.L.C. v. Gulf States Paper Corp., 837 So.2d 801, 806 (Ala.2002). Accord Clark v. Albertville Nursing Home, Inc., 545 So.2d 9, 13 (Ala.1989). ‘In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of the witnesses, and it should accept only that testimony which it considers worthy of belief.’ Clemons v. Clemons, 627 So.2d 431, 434 (Ala.Civ.App.1993).”
Ex parte R.E.C., 899 So.2d 272, 279 (Ala. 2004).
The record, viewed in a light most favorable to the juvenile court’s judgment, reflects that the mother, during her minority, engaged in sexual intercourse with A.D.S. on one occasion during the summer of 2007; at that time, the mother was also involved in relationships of a sexual nature with two other males. On August 11, 2007, the mother discovered that she was pregnant through the use of an over-the-counter pregnancy test; that evening, A.D.S. was sent a telephone text message informing him of the mother’s pregnancy. On the following night, the mother met with A.D.S. at a public park and informed A.D.S. that she was scared about the pregnancy and opined that she believed the child was his, after which the two discussed what to do about the pregnancy; the mother testified that A.D.S. had offered to obtain funds to pay for an abortion, whereas A.D.S. testified that he had stated that he would “be supportive” of whatever the mother’s decision was. One week later, when the mother consulted an adult for advice, A.D.S. asked the mother to inquire of that adult where an abortion could be performed.
*349 However, in September 2007, after the mother had consulted her own mother, she informed A.D.S. that she was no longer planning to have an abortion, whereupon A.D.S. replied that he “was not the only person involved in this” and stated that he believed that he and the mother should not talk anymore; A.D.S. and the mother did not communicate again for several months. When the mother was six months pregnant, she again contacted A.D.S. to inform him that she was planning to execute “papers” to allow the unborn child to be adopted, and she asked A.D.S. to also sign adoption “papers.” A.D.S. again replied that “he wasn’t the only person involved,” asked the mother that he be left alone, and subsequently changed his cellular-telephone number.
Immediately upon the child’s birth on March 28, 2008, the two other males with whom the mother had had sexual relations around the time of the child’s conception filed separate actions in the juvenile court in which each sought an adjudication as to the child’s paternity. However, both actions were voluntarily dismissed on May 22, 2008, upon the plaintiffs’ having received information that genetic-testing results had excluded them as potential fathers of the child. As we have discussed, the child, upon leaving the hospital after birth, went to live with the intervenors, and the intervenors filed an adoption petition in the probate court on April 15, 2008. During the mother’s pregnancy and the 30-day period after the child’s birth, A.D.S. filed nothing with the state Putative Father Registry indicating any intent to claim paternity of the child at issue, although A.D.S.’s father and the mother’s half brother did have a meeting on April 24, 2008, during which A.D.S.’s father stated that A.D.S. had professed to have believed that the child was his “from the very beginning” but that he also believed that the proposed adoption was in the child’s best interests. On May 30, 2008, A.D.S., in the presence of the mother, apparently informed the intervenors that he believed himself to be the child’s father and requested that he be allowed to visit the child and to obtain paternity testing in exchange for not contesting the adoption; however, after A.D.S. had visited with the child five times during June 2008 in the intervenors’ home, the mother’s half brother discovered that A.D.S. did plan to contest the adoption, and visitation was broken off. At no time did the child visit with A.D.S. in his home.
As we noted in J.L.P. v. L.A.M., 41 So.3d 770, 771 n. 1 (Ala.Civ.App.2008), the provisions of the Adoption Code in effect at the time that the intervenors initiated the adoption proceedings in this case “[did] not explicitly require consent of a ‘father’ to a proposed adoption except insofar as a ‘father’ is the ‘presumed father’ or the ‘putative father’ of the child to be adopted.” We further discussed the crucial distinction between the two terms in this context at some length:
“The terms ‘presumed father’ and ‘putative father’ mean different things under the Adoption Code: a ‘presumed father’ is ‘ [a] ny male person as defined in the Alabama Uniform Parentage Act,’ i.e., Ala.Code 1975, § 26-17-1 et seq. (‘the AUPA’), whereas a ‘putative father’ is ‘[t]he alleged or reputed father.’ Compare Ala.Code 1975, § 26-10A-2(ll), with Ala.Code 1975, § 26-10A-2(12). There is a further significant difference between the two classifications. Under the Adoption Code, a ‘presumed father’ of a child who has never married or attempted to marry that child’s mother is afforded an unqualified, right to object to a proposed adoption of that child, regardless of the child’s actual paternity, if ‘[h]e received the adoptee into his home and openly held out the adoptee as *350 his own child.’ Ala.Code 1975, § 26-10A-7(a)(3)d.
“In contrast, a ‘putative father’ who is made known to the court considering the adoption is merely given the right to object to an adoption ‘provided he complies with Section 26-10C-1,’ i.e., the [PFRA]. Ala.Code 1975, § 26-10A-7(a)(5). That language reflects that, since 2002, a required consent is deemed given by implication by a failure to comply with [the PFRA]; such consent so implied ‘may not be withdrawn by any person.’ Ala.Code 1975, § 26-10A-9(a)(5) and (b). In turn, § 26-10C-l(a) provides for a central putative-father registry in which are to be recorded the names of, and other information concerning, any person filing a notice of intent to claim paternity of a child. The penalty for failing to file such a notice of intent is, under the [PFRA], severe:
“ ‘Any person who claims to be the natural father of a child and fails to file his notice of intent to claim paternity pursuant to [the PFRA] prior to or within 30 days of the birth of a child born out of wedlock[] shall be deemed to have given an irrevocable implied consent in any adoption proceeding.
“ ‘This subsection shall be the exclusive procedure available for any person who claims to be the natural father of a child born out of wedlock on or after January 1, 1997, to entitle that person to notice of and the opportunity to contest any adoption proceeding filed and pending on or after January 1,1997.’
“Ala.Code 1975, § 26-10C-l(i).”
J.L.P., 41 So.3d at 771.
This appeal concerns whether A.D.S. “received the adoptee into his home and openly held out the adoptee as his own child” as that phrase is used in Ala. Code 1975, § 26-10A-7(a)(3)d., a portion of the Adoption Code. The language of that provision closely parallels that formerly used in Ala.Code 1975, § 26-17-5, a portion of the Uniform Parentage Act (“UPA”) that dealt with who was a “presumed father” for purposes of determining parentage under Alabama law. Although the Adoption Code uses the conjunctive “and” to link together the reeeption-into-the-home and openly-holding-out elements of presumed paternity, the UPA linked those terms with a disjunctive “or,” indicating either would suffice to establish a presumption of paternity. A.D.S., among other arguments, seizes upon this distinction to claim that he should be deemed to be a “presumed father” in this case based solely upon an “openly-holding-out” rationale even though, he claims, the actions of the intervenors and the juvenile court prevented him from receiving the child into his home. However, the validity of that argument assumes that the evidence adduced at trial would support only one proper conclusion: that A.D.S. openly held out the child as his own child at the legally pertinent time so as to qualify for the UPA’s paternity presumption.
Under the Adoption Code, a man who has never been married to the mother of his biological child and who has not complied with the PFRA must already have “received the [child] into his home and openly held out the [child] as his own child” in order to wield veto power over a proposed adoption of the child by virtue of being a “presumed father.” Ala.Code 1975, § 26-10A-7(a)(3)d. However, the evidence presented to the juvenile court indicates that, at the time that the adoption proceedings were initiated by the in-tervenors in the probate court, A.D.S. had done nothing to indicate that the child was his child — he had provided no material support or housing to the mother during *351 the pregnancy, he had announced to no one in the community that the mother’s fetus would be his child, and he took no steps to initiate a paternity action before the child’s birth. Instead, the juvenile court could properly have concluded that, during the pregnancy and the immediate aftermath of the child’s birth, A.D.S. had been content to rely upon the belief that one of two other men who had had more sustained sexual access to the mother was the child’s father. Thus, at the time that the matter of the child originally came before the probate court in the adoption action, A.D.S. had in no way acknowledged his potential paternity in such an overt manner that it could reasonably have been concluded that A.D.S. had openly held out the child as his own child. Although A.D.S. did assert to others in the community his claim of parentage, and although he did file a paternity action after the adoption proceedings were already underway, the Adoption Code in no way permits such nunc pro tunc actions to suffice as means to achieve “presumed father” status.
J.L.P., in which the biological father (whom we held to be a presumed father) had initiated a paternity action as to the pertinent child one month after that child’s birth and had prosecuted that action to a successful conclusion, is distinguishable; the adoption proceedings were commenced in that case several years after the biological father’s paternity had been adjudicated and he had been awarded and had exercised visitation with the child. Similarly, in M.M. v. D.P., 10 So.3d 605 (Ala.Civ.App.2008), we concluded that the biological father was a presumed father under the Adoption Code because the evidence in that case indicated that he had been awarded (and had exercised) visitation rights with the pertinent child, including at the father’s home, and had complied with an order compelling him to pay child support. In both cases, the pertinent adoption proceedings were undertaken well after the biological fathers of the children at issue had come forward and had been judicially determined to be the children’s fathers and had consistently acted in a manner fully consonant with an intent to play a parental role in the lives of the children.
We derive further support for our holding from analogous authority from New Mexico, whose adoption statutes permit a man to be deemed an “acknowledged father” of a child under six months of age, so as to confer upon him the power to veto a proposed adoption of that child, when that man has “openly held out the adoptee as his own child by establishing a custodial, personal or financial relationship with the adoptee” by, among other things, having “initiated an action to establish paternity.” See N.M. Stat. § 32A-5-17A.(5) & § 32A-5-3F.(4)(a)(1). In Helen G. v. Mark J.H., 143 N.M. 246, 175 P.3d 914 (2007), the New Mexico Supreme Court rejected the proposition that a man who had failed to file with that state’s Putative Father Registry by the applicable deadline could nonetheless properly claim veto power over an adoption via attaining “acknowledged father” status by filing a paternity action after an adoption petition had been filed. In concluding that “a biological father must take action to become an acknowledged father before the adoption petition is filed,” the New Mexico court reasoned that “[i]t defies logic that a father would be able to bypass that time-sensitive [registration] requirement, only to gain acknowledged father status months later by doing essentially the same thing, filing a paternity suit.” 143 N.M. at 253,175 P.3d at 921.
Even were we to conclude that the evidence before the juvenile court compelled a conclusion that A.D.S. held out the *352 child as his own, which might suffice to warrant a paternity presumption under the UPA, we are nonetheless confronted with the undisputed fact that A.D.S. has never received the child into his home, which is a separate and independent requirement for a paternal presumption to arise under the Adoption Code so as to permit A.D.S. to exercise veto power over the adoption. As the California Supreme Court has noted, such a requirement entails “physically bring[ing] the child into his home,” for a man cannot “constructively receive a child into his home.” In re Adoption of Michael K, 10 Cal.4th 1043, 1051, 48 Cal.Rptr.2d 445, 449, 898 P.2d 891, 895 (1995). Although there was evidence indicating that living accommodations in A.D.S.’s home for the child have been prepared, there is no question that the child has not visited that home even once, before or after the filing of the adoption petition by the intervenors. Although we acknowledge A.D.S.’s argument that he has been prevented from bringing the child into his home by the mother, the intervenors, and/or the probate and juvenile courts, we may not properly read such an exception into the Adoption Code.
We thus conclude that the juvenile court correctly determined A.D.S. to be a putative father, rather than a presumed father, under the Alabama Adoption Code based upon the facts of this case.[1] Although A.D.S. contends that classifying him as a putative father violates constitutional principles of due process, we noted in M.V.S. v. V.M.D., 776 So.2d 142, 149 (Ala.Civ.App.1999), that “due process for unwed fathers requires that state law provide an adequate opportunity for them to claim paternity and to take responsibility for their children in a timely manner,” and we added that “limits on procedural protection for a putative father are necessary from the perspective of the child, who needs a stable start in life and needs stability early.” The PFRA and the Adoption Code, taken together, afford males claiming the be the fathers of children out of wedlock, as A.D.S. has claimed to be the father of the child at issue in this case, a clear right to notice and rights to give or withhold consent to a proposed adoption upon compliance with those statutes. Without having shouldered those relatively light burdens during the mother’s pregnancy or the 30-day period following the child’s birth so as to ensure his substantive parental rights, A.D.S. is in no position to claim that his subsequent objections to the proposed adoption and professions of readiness to be a parent are anything more than mere appeals to biological affinity. Stated another way, A.D.S.’s due-process attack on the juvenile court’s judgment must fail because he failed to “establish[] a substantial relationship with the child to merit constitutional protection.” M.V.S., 776 So.2d at 146.
Based upon the foregoing facts and authorities, the juvenile court’s judgment is due to be affirmed.
AFFIRMED.
THOMPSON, P.J., and BRYAN, THOMAS, and MOORE, JJ., concur in the result, without writings.

. We thus do not reach the merits of the intervenors' alternative argument in support of affirmance: that A.D.S., based upon the evidence adduced at trial, gave implied consent to the adoption via abandonment of the adoptee by virtue of his pre-birth conduct towards the mother. See generally Ala.Code 1975, § 26-10A-9(a)(l) (specifying that abandonment includes "the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth”).